No. 02-489

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 119

STATE OF MONTANA,

        Plaintiff and Respondent,

   v.

IVAN LYNN BOWMAN,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Tenth Judicial District,
In and for the County of Fergus, Cause No. DC-2000-51
The Honorable E. Wayne Phillips, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

        Nathan J. Hoines, Hoines & Ferguson, Great Falls, Montana

      For Respondent:

        Honorable Mike McGrath, Montana Attorney General, Barbara C. Harris,
Assistant Attorney General, Helena, Montana; Thomas P. Meissner, Fergus
County Attorney, Lewistown, Montana

Submitted on Briefs:  April 17, 2003

Decided:  May 4, 2004

Filed:

_____
                      Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1    Ivan Lynn Bowman (Bowman) appeals from a Tenth Judicial District, Fergus County judgment convicting him of hunting during a closed season and possession of an unlawfully killed game animal.  We affirm.

¶2    We restate the issues on appeal as follows:

¶3    1.  Did the District Court err in denying the defendant's motion to suppress evidence seized without a search warrant?

¶4    2.  Did the District Court err in denying the defendant's motion to suppress evidence seized pursuant to the search warrants issued on December 6, 1999 and April 6, 2000?

¶5    3.  Did the District Court abuse its discretion in not holding a hearing, under the standards set forth in *Daubert v. Merrell Dow Pharms., Inc.* (1993), 509 U.S. 579, 113 S.Ct. 2786, 125 L.E.2d 469, before the State's expert testified and was it error to limit cross-examination of the same expert witness?

¶6    4. Did the District Court properly deny three of the defendant's proposed jury instructions?

¶7    5. Whether there was sufficient evidence to support the jury's guilty verdict.

**FACTUAL AND PROCEDURAL BACKGROUND**

¶8    In September of 1999, Bowman contacted Larry Jensen (Jensen), owner of Judith Mountain Taxidermy (JMT), about bringing in an elk cape from a bull elk Bowman had recently brought down during bow season.  Jensen agreed to mount the elk for Bowman. Bowman then took the whole elk to Hilger Meats to have the cape removed and the meat

2

processed. Bowman left the elk with Larry Bielen (Bielen), owner of Hilger Meats. Bielen caped out the elk and noticed holes in the cape. He thought the holes were caused during a fight with another elk. After Bielen caped out the elk, he went on vacation and two of his employees, Tim Moline (Moline) and Les Smith (Smith), processed the elk.

¶9    While Smith was cutting the neck portion of the elk, he found a mushroomed bullet impaled against the elk's vertebrae and showed it to Moline. Moline and Smith decided to save the vertebrae and put it in a cooler with a note to Bielen. When Bielen returned from vacation, he threw the vertebrae away. He testified that he did this because he did not want to get Bowman into trouble because of the amount of business Bowman brought Bielen. Eventually, Bielen's conscience got the better of him and he was afraid that one of his employee's would turn him in so, in October, he made an anonymous call to Bob Barber (Barber), a warden for the Montana Department of Fish, Wildlife, and Parks. From the testimony given at the suppression hearing in August of 2000, it appears that Barber discerned that it was Bielen who was the anonymous caller. Bielen told Barber that Bowman had brought in an elk that was supposedly shot during bow season but a bullet was found impaled against the elk's vertebrae; that the cape was being taken to JMT, and that Bielen wanted to remain anonymous. Based on the tip, Barber called JMT but was informed that no capes had arrived.

¶10    On November 19, Bowman took the cape to JMT. Jensen testified that when Bowman dropped off the cape Bowman said that he hoped it was the right cape. Jensen also testified that after he started working on the cape, he noticed the holes and at first thought

3

that they were antler pokes from a fight with another bull elk but then he noticed lead fragments around the bullet holes. After this discovery, Jensen phoned Bowman to make sure that Bowman had brought in the correct cape and Bowman assured Jensen that he had and told Jensen that he had heard that ranchers in the area had been shooting at wildlife in their hayfields to remove them. After this, it is not entirely clear what happened.

¶11 At the suppression hearing, Jensen testified that he did not call Barber about the cape, but that he did call and leave a message for Barber regarding an unrelated matter. Barber testified that he did receive a message from Jensen; however, the message did reference an elk cape that Barber might be interested in looking at so Barber had called JMT to ascertain whether Jensen was in at that time. Jensen's testimony, on direct, seems to indicate that it was during that phone conversation that Barber asked Jensen if there were any "elk capes that had come in."

¶12 On cross-examination, Jensen testified that once he told Barber that a cape had come in and that it was in Jensen's refrigerator, Barber had asked to see it. Under further questioning though, Jensen testified that he was not sure Barber had called him back and that Barber might have just come down to the shop. However, Jensen was certain that when Barber first came into the shop, the elk was in the refrigerator.

¶13 Barber disagreed with Jensen's testimony. Barber testified that he had not asked Jensen to take the cape out of the refrigerator but that when he arrived at JMT, the cape was already out on Jensen's worktable in the main area of the shop. While at JMT, Barber

4

photographed the cape, drew a picture of it, and examined it. He also found a lead fragment near one of the holes, which he collected as evidence.

¶14 In December, Barber submitted an application for a search warrant to Fergus County Justice Court based on his conversation with Bielen and on what he learned from Jensen, "that the cape showed signs of being pierced with a bullet." The Justice Court granted the application enabling Barber to confiscate the horns and cape of the bull elk from JMT and the elk meat and Bowman's bowhunter tag from Bowman's residence. While Barber was at Bowman's residence, Bowman told Barber how Bowman had shot the elk. Bowman said that he had spotted the elk one morning in the southwestern area of his land and had stalked and shot it with a bow in its front shoulders.

¶15 After the appropriate items were confiscated, the cape was transmitted to the U.S. Fish and Wildlife Service at the Ashland Wildlife Forensics Lab in Ashland, Oregon (hereinafter referred to as "the Lab"). Richard K. Stroud (Stroud), a veterinary medical examiner, at the Lab, reviewed the items. Stroud testified that he examined the cape, took x-rays and photographs of it, measured and examined three holes in the cape, and enlarged the holes to do further studies on it. He concluded, due to the characteristics of the holes and because lead was found near the holes, that bullets had caused the wounds and that, of the three holes, two were entrance wounds and one was an exit wound. In addition, he also observed no evidence of healing, infection, or inflammatory response--inflammatory response is the body's reaction to trauma, which stops when a body dies--and that because none of these

5

symptoms were present, the bullet wounds were made in close proximity to the time of the elk's death.

¶16 In April, another search warrant was issued for Bowman's residence to retrieve Bowman's bow and arrows; photographs of a dead elk with arrows shown in the carcase, and photographs of places or locations which coincided with Bowman's version of how the elk was killed; and various rifles for the sole purpose of examining such rifles. That same day, a criminal complaint was brought against Bowman in the Fergus County Justice Court. The complaint charged Bowman with one count of hunting during a closed season, in violation of § 87-3-104, MCA, and another count of possession of an unlawfully killed game animal, in violation of § 87-3-112, MCA.

¶17 Bowman was found guilty of both counts and thereafter, he appealed to the Tenth Judicial District in Fergus County. The District Court ordered a jury trial. Before trial, Bowman filed various motions: a motion to suppress the evidence Barber obtained at JMT without a warrant; a motion to suppress the evidence obtained from the subsequently issued search warrants; a motion to exclude Stroud as an expert witness or in the alternative for a *Daubert* hearing; and a motion to dismiss or in the alternative, motion to exclude Bielen as a witness. A hearing was held in September of 2001, on Bowman's motions and the District Court denied the motions.

¶18 A jury trial was held in October and the jury was unable to reach a decision. A mistrial was declared and a new trial date was set. Bowman again filed the same aforementioned motions on Monday, April 8, 2002, and the District Court denied the

motions, finding them untimely because Bowman had not complied with the scheduling order, which required all motions to be filed by April 5, 2002. A jury trial was subsequently held and Bowman was found guilty on both counts. Bowman appeals from this verdict.

**STANDARD OF REVIEW**

¶19     We first note that because the State did not argue that Bowman's motions were not timely filed in the District Court, we will address the merits of Bowman and the State's first three arguments based the August 2000 suppression hearing wherein Bowman's various motions were denied. Keeping that in mind, we will not "overturn a District Court's findings of fact regarding suppression hearing evidence unless those findings are clearly erroneous." *State v. Hermes* (1995), 273 Mont. 446, 449, 904 P.2d 587, 589. Findings of fact are clearly erroneous "if they are not supported by substantial evidence, the court has misapprehended the effect of the evidence, or our review of the record convinces us that a mistake has been committed." *State v. Lacasella*, 2002 MT 326, ¶ 10, 313 Mont. 185, ¶ 10, 60 P.3d 975, ¶ 10.

# DISCUSSION

## ISSUE ONE

¶20 *Did the District Court err in denying the defendant's motion to suppress evidence seized without a search warrant?*

¶21 Bowman argues that the evidence, the diagram, measurements, and lead fragments Barber obtained when Barber visited JMT after speaking to Bielen, was unlawfully obtained without a search warrant. Bowman appears to contend that he had an expectation of privacy in the elk cape because Jensen was a private taxidermist[1] not open to the public and Bowman's elk cape was kept in a refrigerator that was not accessible to the public. Bowman also contends that the District Court's analysis in denying Bowman's motion was based on erroneous findings.

¶22 In determining whether or not there was an unlawful search, we first look at whether that person has standing or whether that person has an actual expectation of privacy that society is willing to recognize as objectively reasonable. *State v. Isom* (1982), 196 Mont. 330, 336, 641 P.2d 417, 420; *City of Whitefish v. Large*, 2003 MT 322, ¶ 14, 318 Mont. 310, ¶ 14, 80 P.3d 427, ¶ 14;. We have held that factors such as "the place of the investigation, the control exercised by the person over the property being investigated, and the extent to which the person took measures to shield the property from public view . . ." can be considered in determining whether there is a legitimate expectation of privacy. *State v. Hubbel* (1997), 286 Mont. 200, 209, 951 P.2d 971, 977. In addition, we have also held that

---

[1] Jensen unexpectedly passed away before the second trial.

8

the "[p]lacing an object beyond the purview of the public in a place from which the person has the right to exclude others evidences an actual or subjective expectation of privacy." *State v. Elison*, 2000 MT 288, ¶ 49, 302 Mont. 228, ¶ 49, 14 P.3d 456, ¶ 49.

¶23　In this instance, Bowman has no standing to contest Barber's viewing of the cape at the JMT premises. Rather, Bowman's argument appears to be an attempt to assert Jensen's right of privacy in the JMT premises and works in progress to cover the cape. It is difficult to imagine how Bowman would have an expectation of privacy in this instance. Bowman relinquished possession of the cape, albeit temporarily, to a third party, Jensen, and took no measures to shield the cape from the public's view. *Elison*, ¶ 49. Bowman had done business with Jensen before and knew that when Jensen worked on the animals he used a work table that was visible to anyone who walked into the shop. Also, when Bowman left the cape with Jensen, he never indicated that he wanted the cape shielded from the public, that it was a private matter between only Jensen and Bowman, or that Jensen should not show the cape to anyone. Further, as was brought out in the suppression hearing, it is common knowledge that people who take an animal to a taxidermist do so to have the animal immortalized in permanent form for others to admire. There can hardly be an expectation of privacy in such a display.

¶24　Bowman relinquished any expectation of privacy he had in the cape when he took it to JMT, a business that is open to the public, to have the cape mounted, and, in doing so, did not try to ensure that it would be shielded from public view.

¶25    Bowman's argument that the District Court abused its discretion in failing to suppress the seized evidence because the District Court's analysis was based on erroneous findings is equally unpersuasive. Bowman, in his reply brief, argues that the District Court failed to properly analyze the motion to suppress because the District Court based its findings on a lack of expectation of privacy accompanying the conveyance of the elk to *Hilger Meats* and not *JMT*.[2] This argument fails though because, as stated above, there is no expectation of privacy where, as here, Bowman placed his property in the possession of a third party for mounting without taking any measures to preserve his claim of privacy, even if the transfer of possession was only temporary.

¶26    Accordingly, we hold that the District Court did not err in denying Bowman's motion to suppress the evidence Barber obtained from the Taxidermy shop.

## ISSUE TWO

¶27    *Did the District Court err in denying the defendant's motion to suppress evidence seized pursuant to the search warrants issued on December 6, 1999 and April 6, 2000?*

¶28    Bowman argues that the evidence seized pursuant to the search warrants should have been suppressed because the applications did not state probable cause. Bowman insists that the warrants were based on an anonymous tip and that there was no independent corroboration confirming the informant's tip.

---

[2] This issue, though not mentioned in Bowman's appellate brief was preserved below. It was brought to the District Court's attention at the May 8, 2002 pre-trial conference before the second trial.

¶29     We must analyze whether the court that issued the search warrant "had a substantial basis to determine probable cause existed." *State v. St. Marks*, 2002 MT 285, ¶ 12, 312 Mont. 468, ¶ 12, 59 P.3d 1113, ¶ 12. In analyzing whether probable cause existed, we do not look at "each individual fact presented in the application for search warrant . . ." but rather a "totality of the circumstances." *St. Marks*, ¶ 22.

*December 6, 1999 Search Warrant*

¶30     Bowman contends that there was no independent corroboration supporting the anonymous tip. We have held that if the informant is anonymous, then independent corroboration of the informant's information is required. *State v. Reesman*, 2000 MT 243, ¶ 28, 301 Mont. 408, ¶ 28, 10 P.3d 83, ¶ 28. Bowman argues that the supporting information Barber cited in the application was based solely on hearsay because Barber did not indicate with whom he spoke at Hilger Meats and did not indicate whether he personally observed any of the evidence he obtained from JMT.

¶31     Bowman's argument regarding hearsay has no merit. The application need not state with whom Barber spoke because, even as Bowman acknowledged, this was an anonymous tip. As to corroborating the anonymous tip, the application stated that "[t]he investigating deputy [Barber] learned also that the defendant had taken the cape and horns of the animal to Judith Mountain taxidermy. *The investigating warden learned from the taxidermist that the cape showed signs of being pierced with a bullet*" (emphasis added). While the corroborating information could have been better stated, we conclude, based upon the record, that there was sufficient probable cause to issue the search warrant.

11

¶32 The above emphasized sentence gives the impression that Barber obtained all of his corroborating information from Jensen; however, this is inaccurate. As stated in the facts, it is unclear what exactly Barber and Jensen discussed on the phone or even at JMT and, according to Barber's testimony, Barber took measurements of the holes, diagramed the same, and located a lead fragment and removed it as evidence. While the corroboration could have been better stated in the application, "a determination of probable cause does not require facts sufficient to make a prima facie showing of criminal activity . . ." *State v. Marks*, 2002 MT 255, ¶15, 312 Mont. 169, ¶ 15, 59 P.3d 369, ¶ 15. As earlier noted, to ascertain probable cause, we look at the "totality of the circumstances." St. Marks, ¶ 22, Marks, ¶ 15. The corroboration did disclose inculpatory information, not innocent information, which corroborated the criminal conduct disclosed by the anonymous tipster.

¶33 In *Reesman*, we relied on *State v. Rinehart* (1993), 262 Mont. 204, 864 P.2d 1219, where we held that:

> An affidavit supporting a search warrant is to be interpreted by the magistrate and examined by the reviewing court in a common sense, realistic fashion and without a grudging or negative attitude that will tend to discourage police officers from seeking warrants. Reviewing courts should avoid hyper-technical interpretations of warrant applications and, in doubtful or marginal cases, resolve the issue with the preference for warrants in mind.

*Rinehart*, 262 Mont. at 210-11, 864 P.2d at 1223 (citing *State v. O'Neil* (1984), 208 Mont. 386, 393, 679 P.2d 760, 764). We conclude that Barber obtained independent corroboration after receiving the anonymous tip and, we hold, therefore, that the District Court did not err in denying the motion to suppress evidence obtained from the December search warrant.

12

*April 6, 2000 Search Warrant*

¶34    The April 6, 2000 application[3] contained the same information as the December application with several additions.  The April warrant added that the elk cape discussed in the December application had been seized pursuant to the December warrant and had been sent to the Lab and that the Lab had concluded that the animal had been shot with a high-powered rifle.  The application also indicated that Bowman, at Bowman's residence when the December warrant was served, gave Barber his version of how the animal was killed; showed Barber an arrow that was purportedly used to kill the elk; and showed Barber various photographs of the dead elk with an arrow protruding from it.  Further, the April application stated that Barber obtained reliable information from an experienced elk bow hunter that the photographs probably did not depict realistic arrow placement.

¶35    As with the December application, there was a substantial basis to determine that probable cause existed to issue the April warrant and the District Court did not err in denying the motion to seize evidence obtained pursuant to the April warrant.

---

[3] We note that the April 6 warrant is designated as the application and that the April 6 application is designated as the warrant.  Bowman has not raised this misdesignation as an issue.  Because the two documents substantively meet the requirements of § 46-5-221 and Article II, Section 11 of Montana's Constitution and because we do not see any substantial prejudice to Bowman, we will not find error as a result of the misdesignation.

**ISSUE THREE**

¶36    *Did the District Court abuse its discretion in not holding a hearing, under the standards set forth in Daubert, before the State's expert testified and was it error to limit cross-examination of the same expert witness?*

*The Daubert Hearing*

¶37    Bowman argues that because Stroud's testimony was based on novel science the District Court abused its discretion when it did not hold a *Daubert* hearing. The State argues that Bowman did not identify any science applied by Stroud that would be considered novel science and that Bowman has instead only made claims that Stroud's conclusions are unsupported, incredible, and unreliable.

¶38    The *Daubert* standard is applied in Montana only where there is a question involving novel scientific evidence. *State v. Hocevar*, 2000 MT 157, ¶ 56, 300 Mont. 167, ¶ 56, 7 P.3d 329, ¶ 56. Bowman contends that Stroud's testimony is based on a new field of science because, as Stroud testified in the first trial, the Lab "is the only [forensic laboratory] that is a full-time certified laboratory that deals only with wildlife." This argument is unpersuasive.

¶39    While Stroud works at the only forensic lab that studies wildlife on full-time basis, this fact does not put Stroud's testimony in the realm of novel science. The study of animal anatomy is not a new concept. It coincides with the study of human anatomy and can be dated back to, at the very least, Hippocrates (377-460 B.C.). In addition, schools of veterinary science date back to the mid 18th Century in Europe and about the time of the Civil War in America.

¶40     Aside from the lengthy history surrounding the study of animal anatomy and the development of veterinary schools, Stroud's education, his studies, and his work experience, in the area to which he testified, is extensive.  His education includes a Doctor of Veterinary Medicine and a Masters of Science in veterinary science pathology.  In addition, Stroud has participated in one study, involving seals, where numerous bullet wounds were observed and another study involving deer, "[t]hat was specifically to determine wound ballistic characterization using various firearms."  Further, at the Lab he "primarily deal[s] with either cause of death or pathologic examination of evidence from wildlife . . . [including] birds, eagles, hawks, owls, waterfowl, wolves, deer, elk, marine mammals, even fish."  Lastly, he has completed about 10,000 necropsies, or autopsies, on wildlife ranging from whales to elk, deer, wolves, and many different birds.

¶41     In keeping with his education, studies, and experience, Stroud testified on direct examination that, in his opinion, the holes in the cape were bullet holes; that there was no evidence of healing or infection; that the bullet wounds were in close proximity to the time of death; and that the elk was probably shot with a high powered rifle and high velocity bullet.  During cross-examination, Stroud admitted that he could not be certain what caused the elk's death; that if a bullet was lodged in an elk's neck and did not cause damage to the spinal cord that it might be possible for the elk to drink, rut, and bugle; and that he could not tell, from the pictures of the dead elk with the arrow protruding from it, what organs the arrow may have hit.

15

¶42    Stroud has been extensively schooled in a science with a lengthy history and his testimony reflected knowledgeable conclusions as to how the elk was killed. Apart from demonstrating his expertise on direct examination, Bowman's counsel was able to extensively cross-examine Stroud in relation to his education and experience and establish that Stroud could not say for certain how the elk was killed but that Stroud could only offer his opinion in relation to his education and experience. From Stroud's association with a forensic lab that is the only one in the world that works on a full-time basis with wildlife, it does not follow that his testimony was "novel science."

¶43    Accordingly, we conclude that the District Court did not err when it did not hold a *Daubert* hearing.

*Cross-examination*

¶44    Bowman contends that he was not able to explore all aspects of Stroud's testimony because he was not able to cross-examine Stroud regarding the full contents of a report Stroud had prepared. The State argues that the report was not admitted into evidence but that the District Court allowed Bowman to cross-examine Stroud about information Bowman was interested in without inappropriately referring to an item not in evidence. The State further argues that Bowman's argument is disingenuous because when the State tried to admit the same report into evidence on redirect, Bowman objected claiming that Stroud's testimony was the best evidence.

¶45    We agree with the State and find Bowman's argument to be disingenuous. During Stroud's cross-examination, Bowman apparently thought that Stroud's report was the best

16

evidence when Bowman questioned Stroud about the report. Later, however, during redirect, when the State attempted to admit the report into evidence, Bowman objected stating that Stroud's testimony was the best evidence. Bowman cannot have it both ways. "It is a well-established maxim of law that '[a]cquiescence in error takes away the right of objecting to it.'" *Babcock v. Berg, Lilly, Andriolo*, 2003 MT 111, ¶ 38, 315 Mont. 364, ¶ 38, 69 P.3d 1145, ¶ 38 (Cotter, J. dissenting) (quoting § 1-3-207, MCA).

¶46    In addition to Bowman's argument being disingenuous, the record reveals that Bowman was able to extensively question Stroud about Stroud's assumptions and conclusion. This questioning, as mentioned above, demonstrated that Stroud could not be certain what caused the elk's death; that if a bullet was lodged in an elk's neck and the bullet did not cause damage to the spinal cord, that it might be possible for the elk to drink, rut, and bugle; and that Stroud could not tell, from the pictures of the dead elk with the arrow protruding from it, what organs the arrow may have hit.

¶47    We have held before that discretionary trial court rulings, such as the scope of cross-examination, are reviewed to determine whether the District Court abused its discretion. *State v. Insua*, 2004 MT 14, ¶ 13, 319 Mont. 254, ¶ 13, 84 P.3d 11, ¶ 13. We hold, on the record here, that the District Court did not abuse its discretion when it limited cross-examination of Stroud.

## ISSUE FOUR

¶48    *Did the District Court properly deny three of the defendant's proposed jury instructions?*

¶49    "This Court reviews jury instructions in a criminal case to determine whether the instructions, as a whole, fully and fairly instruct the jury on the applicable law . . . District Court's have broad discretion in formulating jury instructions and our standard of review is whether the court abused that discretion." *State v. German*, 2001 MT 156, ¶ 10, 306 Mont. 92, ¶ 10, 30 P.2d 360, ¶ 10.

*Proposed Jury Instruction No. 29*

¶50    The District Court instructed the jury that there were two kinds of evidence, direct and circumstantial. As to direct evidence the District Court instructed that "[d]irect evidence is when a witness testifies directly of his/her knowledge of the main fact or facts to be proved." Regarding circumstantial evidence, the District Court instructed that, "[c]ircumstantial evidence is proof of facts or circumstances from which the jury may infer other and connective facts which usually and reasonably follow according to the common experience of mankind." The District Court then elaborated and instructed that "[b]oth direct evidence and circumstantial evidence are acceptable as means of proof. Neither is entitled greater weight than the other."

¶51    Bowman contends that he is entitled to an instruction on his theory of the case and that his proposed jury instruction No. 29, on circumstantial evidence, should have been given. Bowman's proposed jury instruction No. 29 read: "To justify a conviction based solely on circumstantial evidence, the facts and circumstances must not only be entirely consistent with the theory of guilt, but must be inconsistent with any other rational theory or conclusion."

18

¶52     Bowman insists that the District Court abused its discretion in refusing to give his instruction because the State's case was based entirely on circumstantial evidence and because his proposed jury instruction No. 29 was a pattern jury instruction based on our decision in *State v. Ryan* (1987), 229 Mont. 7, 744 P.2d 1242.  The State argues that its case was not entirely based on circumstantial evidence, that there was direct evidence that the elk was shot in the neck with a rifle, and that one of the bullets became lodged in the elk's vertebrae.

¶53     While Bowman correctly cites our decision in *Ryan*, his argument ignores our more recent decision in *State v. Hall*, 1999 MT 297, 297 Mont. 111, 991 P.2d 929.  In our discussion in *Hall*, we noted prior case law which held that

> If the circumstantial evidence was susceptible to two reasonable interpretations, one of which points to the defendant's guilt and the other to his innocence, it is the duty of the jury to adopt the interpretation which points to the defendant's innocence and reject that interpretation which points to his guilt.

*Hall*, ¶ 22 (quoting *State v. Lucero* (1984), 214 Mont. 334, 339, 693 P.2d 511, 513-14). However, further discussion in *Hall* pointed out more recent decisions which state that "'when circumstantial evidence is susceptible to two interpretations, one which supports guilt and the other which supports innocence, the trier of fact determines which is most reasonable.'" *Hall*, ¶ 22 (quoting *State v. Arthun* (1995), 274 Mont. 82, 91, 906 P.2d 216, 222).

¶54 The instructions the District Court gave adequately instructed the jury in accordance with the law and we see no abuse of discretion by the District Court in refusing to give Bowman's proposed jury instruction No. 29.

¶55 Additionally, in light of the aforementioned discussion of *Hall* and the confusion which appears to be present regarding instructions on circumstantial evidence, we caution that Pattern Jury Instruction No. 1-1017(a), proposed jury instruction No. 29 here, is not a correct statement of the law after *Hall* and that practitioners should no longer request that it be given.

*Proposed jury instruction No. 20A*

¶56 Proposed jury instruction No. 20A read,

> [t]he theory of the Defense in this case is that Ivan Lynn Bowman lawfully shot an elk with a bow and arrow during archery season and took legal possession of the elk he harvested. The burden is on the State of Montana to prove beyond a reasonable doubt that Lynn Bowman unlawfully shot the elk with a firearm during archery season. If there is reasonable doubt whether Defendant did shoot the elk with a firearm during archery season you must find Ivan Lynn Bowman not guilty.

¶57 Bowman first argues that proposed jury instruction No. 20A, reflected the charging document and that it was error for the District Court to not instruct the jury based upon the charging document. Bowman cites no authority for the proposition that a jury must be instructed on the language of the charging document. Therefore, we decline to address this argument.

¶58 Bowman next argues that it was also error for the District Court to deny him the right to present an instruction to the jury on what his theory of defense was in the case. Though

20

a defendant is entitled to an instruction on a theory as long as it has support in the evidence, he is not entitled to an instruction concerning every nuance of his argument. *State v. Howell*, 1998 MT 20, ¶ 17, 287 Mont. 268, ¶ 17, 954 P.2d 1102, ¶ 17; *State v. Maloney*, 2003 MT 288, ¶ 27, 318 Mont. 66, ¶ 27, 78 P.3d 1214, ¶ 27. Proposed jury instruction No. 20A--"[t]he theory of the Defense in this case is that Ivan Lynn Bowman lawfully shot an elk with a bow and arrow during archery season and took legal possession of the elk he harvested"--is a statement of facts, not law and "'while a defendant is entitled to have instructions on his theory, he is not entitled to put his arguments in those instructions.'" *State v. Arlington* (1994), 265 Mont. 127, 139, 875 P.2d 307, 314 (quoting *State v. Short* (1985), 217 Mont. 62, 70, 702 P.2d 979, 984).

¶59    Accordingly, we hold that the District Court did not abuse its discretion in denying Bowman's proposed jury instruction No. 20A.

*Proposed jury instruction No. 19*

¶60    Bowman contends that the District Court should have given proposed jury instruction No. 19 because Bielen's testimony was very prejudicial to Bowman and because Bielen's willful destruction of the vertebrae is the same as if the State had destroyed the evidence and so the jury should have been instructed concerning Bielen's actions. Proposed jury instruction No. 19 read, "[i]f you find that the State or the State's witnesses has [sic] destroyed, caused to be destroyed, or allowed to be destroyed, any evidence whose content or quality are an issue, you may infer that the true fact is against the interest of the State."

21

¶61 During trial, the State objected to the instruction because it did not constitute a statement of any law of this state and instead constituted an improper comment on the evidence. The District Court agreed, stating that the real issue was the "credibility of that witness" which . . . the defense ha[d] raised and which [could] . . . be addressed during closing.

¶62 We agree. The record reflects that Bowman was able to extensively cross-examine Bielen regarding Bielen and Bowman's relationship and was able to establish that Bielen did not like Bowman. Further, as the District Court indicated, Bowman could have again discussed Bielen's destruction of the vertebrae in Bowman's closing argument.

¶63 For the reasons stated above, we hold that the District Court did not abuse its discretion in refusing to give proposed jury instruction No. 19.

## ISSUE FIVE

¶64 *Whether there was sufficient evidence to support the jury's guilty verdict.*

¶65 Bowman simply argues that there was insufficient evidence to support the jury's guilty verdict because there was no direct evidence that he shot the elk with a firearm. The State counters that there was direct evidence.

¶66 "In determining the sufficiency of the evidence, this Court determines, after viewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Elliott*, 2002 MT 26, ¶ 86, 308 Mont. 227, ¶ 86, 43 P.3d 279, ¶ 86.

22

¶67 The evidence established that the size of the entrance wounds in Bowman's elk cape were similar to the caliber of more than one of the rifles found and seized in Bowman's home; that the elk Bowman possessed died in close proximity to the time the bullet wounds were made; that, given position of the entrance and exit wounds on the cape, the bullet(s) likely caused damage to a major artery, vein and/or muscle tissue, caused shock to the spinal cord; and also could have hit the larynx and trachea. To contrast, the arrow, identified by Bowman as the one having killed the animal, had plant material on the blade which was probably from the elk's stomach.

¶68 Accordingly, we hold that after viewing the evidence in a light most favorable to the prosecution, the jury here could have found the essential elements of the crime beyond a reasonable doubt.

¶69 Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ KARLA M. GRAY

/S/ W. WILLIAM LEAPHART

/S/ PATRICIA O. COTTER

/S/ JIM RICE