05-385

IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 235

_____

STATE OF MONTANA,

       Plaintiff and Respondent,

  v.

MARK NEIL MISNER,

       Defendant and Appellant.

_____

APPEAL FROM:   District Court of the Eighth Judicial District,
                   In and For the County of Cascade, Cause No. DDC 03-616
                   Honorable Kenneth R. Neill, Presiding Judge


COUNSEL OF RECORD:

       For Appellant:

           Kristina Neal, Assistant Appellate Defender, Helena, Montana

       For Respondent:

           The Honorable Mike McGrath, Attorney General; C. Mark Fowler,
           Assistant Attorney General, Helena, Montana

           Brant Light, Cascade County Attorney, Great Falls, Montana

_____

                 Submitted on Briefs:  January 4, 2007

                         Decided:  September 13, 2007

Filed:

        _____
                       Clerk

Chief Justice Karla M. Gray delivered the Opinion of the Court.

¶1      The State of Montana charged Mark Neil Misner with two counts of deliberate homicide in the deaths of Danny Hutchison and Wanda Lynn Hutchison. A jury in the Eighth Judicial District Court, Cascade County, found Misner guilty of both counts, and the court entered judgment against him. Misner appeals. We affirm.

¶2      We restate the issues on appeal as follows:

¶3      1.      Did the District Court abuse its discretion in denying Misner's motion for a new trial?

¶4      2.      Is Misner's claim of ineffective assistance of counsel meritorious?

¶5      3.      Did the District Court err in refusing one of Misner's proposed jury instructions?

## BACKGROUND

¶6      On the afternoon of November 20, 2003, Mark Neil Misner and his friend and landlord Danny Hutchison went to the Heidelberg Bar in Great Falls, Montana, where they drank, played pool, and danced to jukebox songs. Misner was renting a room in Hutchison's house a few blocks from the bar. Misner and Hutchison later were joined at the bar by Hutchison's ex-wife, Wanda Lynn Hutchison. Hutchison and Wanda Lynn discussed the possibility of her moving back into Hutchison's house and helping him make mortgage payments on it to avoid foreclosure. Misner left the bar between 4:30 and 5:30 p.m., and the others stayed until approximately 8:30 p.m.

¶7      Just after 2 a.m. the next morning, Misner arrived at his cousin's home in Black

Eagle, Montana, and asked to spend the night. He explained that he had been locked out of Hutchison's home. Misner slept at his cousin's house and, when he awoke later that morning, said he was returning to Hutchison's.

¶8 Shortly thereafter, a neighbor observed Misner knocking on the doors of Hutchison's house and peering into the bay window of the kitchen. The neighbor did not see Misner get into the house and Misner did not ask the neighbor for help. Misner then drove to the Heidelberg Bar, where he asked the bartender and the "regulars" if anyone had keys to Hutchison's house. He also used the bar's telephone to call 911 for police, saying he had seen Hutchison slumped over the kitchen table.

¶9 Joe Henderson, a bar patron and friend of Hutchison's, followed Misner back to Hutchison's house, looked in the kitchen bay window and saw Hutchison. Henderson kicked the front door open. He and Misner entered the home and saw the bodies of Hutchison and Wanda Lynn in the blood-splattered kitchen. They immediately went back outside, where police arrived moments later in response to Misner's 911 call.

¶10 Both Hutchisons had suffered fatal head injuries. Hutchison had been beaten to death, and Wanda Lynn had been beaten and shot twice in the head. All of the doors to the house had been deadbolted shut. No murder weapon was found.

¶11 Great Falls police detectives questioned Misner that afternoon. He gave an extensive videotaped interview regarding his activities on November 20 and the morning of November 21. According to Misner, Hutchison had asked him to "make himself scarce" on the evening of November 20, because Wanda Lynn was planning on spending the night at the house with Hutchison. Misner told the police officers that, when he left

3

the Heidelberg Bar that afternoon, he went back to the house, showered and changed clothes, and left again before Hutchison and Wanda Lynn arrived there. Misner then narrated a long, intricate description of routes he drove around town all evening until he finally went to his cousin's house around 2 a.m.

¶12 Misner told the detectives he was not able to enter Hutchison's house on the morning of November 21 by his usual method—using a garage door opener and then a door from the garage to the house—because the battery in his garage door opener had died and he had left the dead battery on the kitchen windowsill. He explained a fresh cut on his finger as an injury from working on his truck's clutch two days earlier. When Misner later responded to a detective's request for a chronology of all his activities over the previous four days, however, he did not mention working on the truck clutch. Misner also told officers that he did not own or possess a gun.

¶13 Approximately one month later, the State of Montana filed an Information charging Misner with two counts of deliberate homicide. His trial was held in January of 2005.

¶14 At the weeklong jury trial, the State's evidence against Misner was entirely circumstantial. The State showed the jury Misner's videotaped statement. It presented testimony from Misner's cousin and the cousin's wife that they were surprised when Misner showed up around 2 a.m. at their house, where he had never before spent the night. The cousin also testified Misner asked them to wash his jacket the following morning but then left for Hutchison's house without it.

¶15 In addition, the State presented testimony from Hutchison's neighbor, several

4

friends and family of Misner and the victims, Heidelberg Bar patrons and bartenders, and the officers who investigated the crime. A friend of Misner's testified that he had loaned Misner a .22 rifle the summer before the murders, which Misner had never returned. A bartender testified that Misner called her at around 6 p.m. on the night Hutchison and Wanda Lynn were killed, asking her to pick him up to go out dancing because he was too drunk to drive himself; she declined. Friends of Wanda Lynn's testified that she never would have left her little dog home alone—which she did the night she was killed—if she had been planning to spend the night away from home. A police officer testified he had tested the battery on the windowsill which Misner had identified as dead. The battery was not dead and, when the officer put it into the garage door opener, the garage door opener worked on the first try.

¶16 Great Falls police officers and a forensic scientist from the Montana State Crime Lab testified extensively about blood types, and about spatter, pooling and trace patterns of blood and DNA found at the crime scene and on Misner's clothing. Numerous photographs of the bloody crime scene were introduced into evidence. An envelope addressed to Qwest—spattered with dark red stains and found on the kitchen windowsill behind the battery Misner identified as from his garage door opener—was admitted into evidence, along with three other envelopes and the battery found on the windowsill with no apparent blood on them. The State Crime Lab forensic scientist testified that blood consistent with Misner's and Wanda Lynn's DNA profiles was in the drain of the kitchen sink, and indications of blood with a DNA mixture consistent with Misner's and Hutchison's was on the bathroom showerhead.

¶17 Misner presented an expert witness who testified that Misner's DNA at the crime scene might be explained by the facts that he lived in the house with Hutchison and had been socializing with Hutchison and Wanda Lynn before they were killed. During settlement of jury instructions, Misner offered an instruction regarding evidence which might support two reasonable interpretations, which the District Court refused to give. Misner's counsel argued in closing that the State had not carried its burden of proving Misner guilty beyond a reasonable doubt and that the State's evidence of his guilt was also consistent with his innocence.

¶18 The jury found Misner guilty on both counts of deliberate homicide. After he was convicted but before sentencing, Misner moved for a new trial, arguing comments made by the prosecutor during rebuttal closing argument constituted prosecutorial misconduct because they went beyond the evidence and deprived him of his right to a fair trial. The State responded, and the District Court heard oral argument. The court denied the motion for a new trial orally and, later, in writing but without written comment. The District Court then sentenced Misner and entered judgment. Misner appeals.

ISSUE 1

¶19 **Did the District Court abuse its discretion in denying Misner's motion for a new trial?**

¶20 We review decisions on motions for new trial under an abuse of discretion standard. *State v. Clay*, 1998 MT 244, ¶ 13, 291 Mont. 147, ¶ 13, 967 P.2d 370, ¶ 13 (citation omitted).

¶21 During his rebuttal closing argument, the prosecutor made certain statements and

posited the theory that Misner had "staged" the crime scene. The defense did not object.

¶22 Later, in Misner's motion for a new trial, the defense argued the comments made by the prosecutor during closing argument had deprived Misner of a fair trial. The State filed a response brief. The District Court held a hearing on the motion for a new trial, at the end of which it orally denied the motion on the basis that Misner had waived objection to the prosecutor's comments by failing to object during closing argument. With the disclaimer "in no way suggesting that what I just said was not dispositive," the trial court then went on to address the merits of the motion for a new trial. It ultimately determined that, in the "big picture," there was "all kinds of evidence" about blood spatter in this case, in light of which the prosecution's closing argument about what the evidence showed was not prosecutorial misconduct.

¶23 On appeal, Misner points out the impropriety of prosecution comments on evidence not of record during closing argument. *See State v. Newman*, 2005 MT 348, ¶ 30, 330 Mont. 160, ¶ 30, 127 P.3d 374, ¶ 30 (citation omitted). Misner moved for a new trial on grounds that the prosecutor had engaged in misconduct by suggesting to the jury that spatter marks on the Qwest envelope on the kitchen windowsill at the crime scene was blood spatter. He points out that, although the envelope to which the prosecutor referred had been admitted into evidence, no expert testified that the spatter on it was, in fact, blood. Misner contends the above comment by the prosecutor in rebuttal closing argument may have contributed to his conviction and, therefore, he is entitled to a reversal. *See State v. Sullivan*, 280 Mont. 25, 927 P.2d 1033 (1996).

¶24 The State raises the threshold argument that, to be timely, an objection must be

made as soon as the grounds for objection become apparent. Where a defendant failed to object to a prosecutorial comment during rebuttal closing argument, instead raising the objection for the first time in a motion for a new trial, we concluded the defendant had waived the objection to the prosecutor's comment and we could not consider the issue. *See State v. Grace*, 2001 MT 22, ¶ 35, 304 Mont. 144, ¶ 35, 18 P.3d 1008, ¶ 35. Neither the District Court in its ruling on the motion for a new trial, nor Misner in his argument on this issue on appeal, has addressed *Grace*, which is controlling precedent.

¶25 In partial response to the State's waiver argument, Misner relies on *Clausell v. State*, 2005 MT 33, 326 Mont. 63, 106 P.3d 1175 (*Clausell II*), which was an appeal of a denial of a petition for postconviction relief. In *Clausell II*, ¶ 12, we noted that, on Clausell's direct appeal, we had declined to address his objections to remarks made by the prosecutor during closing arguments because Clausell had failed to contemporaneously object to the remarks. *See State v. Clausell*, 2001 MT 62, ¶¶ 43-45, 305 Mont. 1, ¶¶ 43-45, 22 P.3d 1111, ¶¶ 43-45 (*Clausell I*). In the postconviction proceeding, the district court addressed the claim that the remarks during closing argument were improper. We, too, addressed that claim in the appeal of the postconviction proceeding, because of "the District Court's decision to analyze the issue and the close nexus between Clausell's prosecutorial misconduct claims and his ineffective assistance of counsel claims." *Clausell II*, ¶ 12. We rejected Clausell's contentions on the basis that he had had the opportunity to present his explanations of events at trial and, ultimately, affirmed the district court's determination that the prosecutor had not engaged in misconduct. *Clausell II*, ¶ 18.

8

¶26 We agree with the District Court that our *Clausell* decisions support its denial of Misner's motion for a new trial, where no objections were made to the prosecution's remarks at the time they were made. *See Clausell I*, ¶¶ 43-45; *Clausell II*, ¶ 12. Because Misner made no objection to the prosecutor's remarks when they were made, but instead objected for the first time in a motion for new trial, we conclude he waived his claim of prosecutorial misconduct. We hold that the District Court did not abuse its discretion in denying the motion for a new trial.

ISSUE 2

¶27 **Is Misner's claim of ineffective assistance of counsel meritorious?**

¶28 Misner claims his counsel rendered ineffective assistance by failing to object to the prosecutor's remarks in closing argument. He did not raise this claim in his motion for a new trial in the District Court.

¶29 A criminal defendant has been denied effective assistance of counsel if counsel's conduct fell short of the range reasonably demanded in light of the Sixth Amendment to the United States Constitution, and counsel's deficient conduct is prejudicial. *State v. Rose*, 1998 MT 342, ¶ 12, 292 Mont. 350, ¶ 12, 972 P.2d 321, ¶ 12 (citation omitted). To establish prejudice, a defendant must establish that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Rose*, ¶ 19 (citation omitted).-

¶30 For purposes of determining whether Misner could establish prejudice from his counsel's failure to object during rebuttal closing argument, we need only review the District Court's disposition of his motion for a new trial on its merits. As stated above,

9

Misner moved for a new trial on grounds that the prosecutor had engaged in misconduct by suggesting to the jury that spatter marks on a Qwest envelope on the windowsill at the crime scene were blood spatter. At the hearing on his motion for new trial, Misner pointed out to the District Court that there had been no expert testimony identifying the spatter marks on that envelope as blood.

¶31 As mentioned above, the District Court first denied the motion for a new trial on the basis that objection to the closing argument had been waived. It also denied Misner's motion for a new trial on the merits, explaining that "you have to look at the big picture." The court noted "all kinds of" evidence in this case about blood spatter, photographs depicting "an awful lot of blood spatter" and, in general, "á very bloody crime scene[,]" as well as the numerous photographs in evidence showing "blood on the walls and on the floor and so on." The court then noted the jury would certainly draw its own conclusions about whether what they were looking at in a particular exhibit was blood.

¶32 The District Court went on to observe that the prosecutor had referred in closing argument to the testimonies of the State's and Misner's blood experts about patterns typical of blood spatter. The prosecutor also had reminded the jury that the Qwest envelope was positioned in an area in which the defense expert had identified numerous other items as having blood spatter on them. Finally, the District Court stated the prosecution's inference that the substance on the Qwest envelope was blood spatter was based on the evidence and testimony presented at trial. It ultimately determined the prosecution's comments were appropriate references to the evidence presented and reasonable inferences therefrom, and denied the motion for a new trial.

¶33 An attorney may argue and draw reasonable inferences from evidence if there are facts to support such statements. *State v. Bashor*, 188 Mont. 397, 417, 614 P.2d 470, 481 (1980) (citation omitted). Here, the Qwest envelope had been admitted into evidence, as had three smaller envelopes found in front of the Qwest envelope on the kitchen windowsill. The defense's expert witness had testified there was no physical evidence to contradict Misner's claim he had placed the dead battery for his garage door opener on the kitchen windowsill prior to the night the victims were killed. The prosecutor stated the large Qwest envelope from the kitchen windowsill was full of "spatter," but pointed out that the three smaller envelopes did not have visible spots or stains on them. He then posited that Misner had "staged" the crime scene by placing the smaller envelopes and the battery from his garage door opener on the windowsill after the crimes were committed. That remark was fair and reasonable in light of the evidence, and we conclude the District Court did not abuse its discretion in denying the motion for a new trial on its merits.

¶34 Given the District Court's proper denial of Misner's motion for a new trial on the merits, we conclude no reasonable probability exists that, had counsel objected to those remarks during closing argument, the result of the proceeding would have been different. As a result, we conclude Misner was not prejudiced by his counsel's failure to object at that time and hold that Misner's claim of ineffective assistance of counsel is without merit.

## ISSUE 3

¶35 **Did the District Court err in refusing one of Misner's proposed jury**

11

**instructions?**

¶36 Misner proposed the District Court instruct the jury as follows:

> If you find the evidence supports two reasonable interpretations, one of which supports guilt and the other of which supports innocence, reasonable doubt exists, and you must acquit.
>
> Likewise, if one interpretation of the evidence appears to you to be reasonable and the other interpretation unreasonable, it is your duty to accept the reasonable interpretation and to reject the unreasonable.

The District Court refused to give this instruction and Misner asserts error.

¶37 In general, we review jury instructions to determine whether the instructions, as a whole, fully and fairly instruct the jury on the law applicable to the case. *State v. Vernes*, 2006 MT 32, ¶ 20, 331 Mont. 129, ¶ 20, 130 P.3d 169, ¶ 20 (citation omitted). A proposed jury instruction is properly refused if it is an incorrect statement of the law. *See City of Helena v. Barrett*, 245 Mont. 35, 37, 798 P.2d 544, 545 (1990) (citation omitted).

¶38 Misner advances *State v. Sheriff*, 188 Mont. 26, 31, 610 P.2d 1157, 1159-60 (1980), for the proposition that, when a jury finds two interpretations of the evidence equally reasonable—one of which points to the defendant's guilt and the other to his innocence—the jury must accept the interpretation which points to the defendant's innocence. He insists that the *Sheriff* proposition remains good law. We disagree.

¶39 In *State v. Hill*, 2005 MT 216, 328 Mont. 253, 119 P.3d 1210, we clarified the impropriety of instructing a jury that, in order to be sufficient to convict, circumstantial evidence must be both consistent with a theory of guilt and inconsistent with any other rational conclusion. We stated the correct rule that, when circumstantial evidence is susceptible to two interpretations, one of which supports guilt and the other innocence, it

12

is the function of the trier of fact to determine which is most reasonable. *Hill*, ¶ 17 (citing *State v. Bowman*, 2004 MT 119, ¶ 53, 321 Mont. 176, ¶ 53, 89 P.3d 986, ¶ 53).

¶40 Misner's proposed instruction would require the jury to acquit if it found the evidence could support either innocence or guilt. Pursuant to *Hill*, the instruction Misner proposed would have been improper, and the District Court did not err in refusing to give it.

¶41 Affirmed.

/S/ KARLA M. GRAY

We concur:

/S/ JAMES C. NELSON
/S/ JOHN WARNER
/S/ BRIAN MORRIS

Justice W. William Leaphart, concurring.

¶42 I specially concur. Given our conclusion in Issue two, I question the necessity to analyze Issue one—that is, whether defense counsel waived objection to the prosecutor's comments by failing to object contemporaneously during closing argument. If, as we conclude in Issue two, the comments were "fair and reasonable" and did not prejudice the defendant, then logic dictates that there was no basis for an objection in the first instance. Since there was no basis for an objection, it is entirely unnecessary to impugn the performance of defense counsel by concluding that he failed to make a timely objection.

13

The Opinion should simply conclude that since the prosecutor's comments were fair and reasonable, defense counsel was not ineffective for failing to object to the comments and the District Court did not abuse its discretion in denying the motion for a new trial.

/S/ W. WILLIAM LEAPHART