No. 00-077

IN THE SUPREME COURT OF THE STATE OF MONTANA

2001 MT 22

STATE OF MONTANA,

Plaintiff and Respondent,

v.

MARC GRACE,

Defendant and Appellant.

APPEAL FROM: District Court of the Eighth Judicial District,

In and for the County of Cascade,

The Honorable Kenneth R. Neill, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Jeff R. Lynch, Alexander, Baucus, Taleff & Paul, P.C., Great Falls, Montana

For Respondent:

Hon. Joseph P. Mazurek, Attorney General; Tammy K. Plubell, Assistant Attorney General, Helena, Montana

Brant S. Light, Cascade County Attorney, Great Falls, Montana

Submitted on Briefs: August 31, 2000
Decided: February 15, 2001

Filed:

_____

Clerk

Justice Jim Regnier delivered the Opinion of the Court.

¶1 After trial by jury, Marc Grace was convicted of robbery and theft in the Eighth Judicial District Court, Cascade County. Grace appeals.

¶2 Grace presents two questions on appeal.

¶3 1. Whether the District Court erred in denying Grace's motion for a new trial based on insufficiency of accomplice corroborative testimony?

¶4 2. Whether the District Court erred by denying Grace's motion for a new trial based on the State improperly vouching for the credibility of a witness?

## BACKGROUND

¶5 In April 1998 Marc Grace and his friend Hutch Spangelo were staying together at the Royal Motel in Great Falls, Montana. According to testimony by Spangelo, both men were short of money, and Grace told Spangelo that he was thinking about robbing a bank. On April 10, 1998, Spangelo and Grace traveled to Ulm, Montana, and retrieved a motorcycle that belonged to Grace's friend Rob Turner. Grace told Spangelo that he was borrowing the motorcycle because he needed transportation and he also thought he would use it to rob a bank.

¶6 Upon retrieving the motorcycle, Grace and Spangelo purchased and installed a new battery so that the motorcycle would run. Grace removed the expired license plate from the motorcycle and told Spangelo that if he used the motorcycle in a robbery that it would be harder for anyone to identify without a license plate. On the same day, Grace also purchased a toy gun that he spray painted black.

¶7 After returning to the Royal Motel later that afternoon, Grace asked Spangelo what he should write in a note that he would give to the bank teller during a bank robbery. Spangelo wrote a note to give to the bank teller during the robbery. Later, Grace left the

motel dressed in a blue windbreaker jacket, a pair of blue jeans, white Nike shoes, and Spangelo's white motorcycle helmet. Grace also wore a large sweatshirt under his jacket, apparently to make himself appear larger than his usual size. Spangelo testified that he did not believe that Grace was seriously intending to rob a bank.

¶8 That same afternoon, April 10, 1998, Melony Memanile, Kristine Patton, and Valerie Rawton were all working as bank tellers at Western Security Bank, located on Tenth Avenue South in Great Falls, Montana. All three tellers observed a man enter the bank wearing a motorcycle helmet. Memanile testified that she watched the man move to the island area of the bank, peruse the brochures, and study each of the tellers. The man did not remove his helmet while in the bank. After approximately five minutes he left the bank. Memanile estimated the height of the man at six feet tall and recalled that he was dressed in a blue windbreaker and blue jeans.

¶9 Patton described the man as acting hesitant and recalled that she found it strange that he did not remove his helmet. He spent a few minutes looking at brochures at the center island of the bank, and then left on a black and white motorcycle. Patton noted that the man was wearing jeans and a jacket that zipped. She estimated his height as somewhere between five foot ten inches to six feet tall.

¶10 Rawton confirmed the information provided by Memanile and Patton. After Grace was identified as the robbery suspect, Rawton also confirmed that she and Grace had gone to school together in 1994 and had occasionally socialized. She testified that she had not seen him in approximately a year, but that Grace did match the physical description of the man in the motorcycle helmet who entered the bank on April 10, 1998.

¶11 Spangelo testified that Grace returned to the motel room and was very edgy. Grace then told Spangelo that he went into a bank but realized that he knew one of the tellers, so he grabbed some brochures and left. He then told Spangelo that he was going to "do it now for real." He mentioned a bank on First Avenue North and left again on the motorcycle.

¶12 Christy Nelson was the manager of the downtown branch of Western Security Bank, located on First Avenue North. On April 10,1998, at approximately 4 p.m., Christy was the only teller working in the bank. As Christy was waiting on a customer, she looked out the window and observed a man walking up the sidewalk wearing a large white motorcycle helmet. The man entered the bank and did not remove his helmet. He stood

quietly at an island in the middle of the bank until Christy finished with another customer. He then stepped up to Christy's window, still wearing the helmet, and handed her a note. The note said, "I have a gun. No alarm. No one gets hurt. Give me all your 50s and 100s." The man then said "Just hurry. Hurry. Hurry." Christy, feeling extremely threatened, gave the man $3,750. He stuffed the cash somewhere in his clothing, turned quickly and ran to the door. The dark visor of the helmet prevented Christy from getting a good look at the man's face. She did recall that he was wearing a blue nylon windbreaker, blue jeans, faded white tennis shoes, and a white motorcycle helmet, and appeared bulky and physically fit. Christy estimated that the man was six foot three inches while wearing the helmet.

¶13 After the robbery, Christy Nelson triggered the alarm. The subsequent police investigation revealed that a male wearing a white motorcycle helmet had been at the Western Security Bank on Tenth Avenue South just prior to the robbery at the downtown bank. Surveillance cameras from the bank on Tenth Avenue South indicated that the physical attributes of the man who entered the Tenth Avenue South bank matched those of the man who robbed the downtown bank and indicated that the robber was approximately six foot two while wearing the motorcycle helmet. The customer at the bank prior to the robbery confirmed the description of the robber. The tellers at the bank on Tenth Avenue South also gave descriptions of the man that matched the physical description provided by Christy Nelson at the downtown bank.

¶14 Spangelo testified that Grace returned to the Royal Motel for a second time and told Spangelo that he robbed a bank. He said that he went into the bank and saw a teller helping a woman. He waited for the teller to be free, and then approached her and handed her the note. He could not remember whether he showed her the gun but said that the teller gave him all of her cash. Spangelo put the motorcycle helmet in a bag and threw it in a dumpster behind a convenience store. Spangelo and Grace then went to the mall. Grace purchased several items, including jeans, a shirt, a wristwatch and boots.

¶15 On April 13, 1998, Sergeant Sowell, lead investigator on the case, learned that a man had recently pawned a white motorcycle helmet at a local pawn shop. After retrieving the helmet, he interviewed the man who had pawned the helmet. The man explained that he and his cousin had been looking in dumpsters for moving boxes, found the helmet in one of the dumpsters, and pawned the helmet for $50. DNA samples from the State laboratory indicated that both Spangelo and Grace had worn the helmet, but hair samples found within the helmet were consistent only with Grace.

¶16 A few weeks after the robbery, Grace and Maria Keeney began to date. A short time later, Spangelo moved out of the apartment that he and Grace had been renting together. When Grace learned that Spangelo had moved out of the apartment, Keeney testified that Grace became extremely agitated. Initially, he told Keeney that he was upset because Spangelo was like a brother to him, but later he told Keeney that he was upset because Spangelo could "really screw him over." Grace eventually told Keeney that he and Spangelo had robbed a bank. He explained that he and Spangelo retrieved the motorcycle, and that Grace had used it during the robbery. He also told Keeney that he had worn black pants, a black shirt, sunglasses, a motorcycle helmet, and a big jacket to hide his physique. He then threw away the clothing in a dumpster at a business.

¶17 Grace related to Keeney that he first attempted to rob a bank on Tenth Avenue South, but aborted his attempt when he recognized one of the tellers. He then stated that he went to the downtown branch of the same bank, approached a teller, and handed her the note that Spangelo had written. He described the teller as having a "panicked" look in her eyes, and claimed that he received about $2000 from the robbery. He also told Keeney that he used about $400 or $500 of the money to purchase a watch from J.C. Penney.

¶18 On May 25, 1998, just prior to moving out of the apartment that he and Grace shared, Spangelo contacted a friend who was a Cascade County Deputy Sheriff. After spending several hours together, Spangelo incriminated himself in the robbery. He confessed to writing the note that Grace handed to the bank teller and disposing of items that Grace wore during the robbery. He also relayed the specific events that occurred on the day of the robbery.

¶19 On May 27, 1998, Sergeant Sowell applied for and received a warrant to search Grace's apartment. During the search, Sowell discovered a pair of jeans and a shirt as well as a wristwatch which corroborated some of the details that Spangelo had provided. After the search was completed, Grace asked Sowell if Spangelo moved out because he gave information to the police about the robbery. Grace also commented that if Spangelo died, possibly by committing suicide, then Grace would be cleared because there were no other informants. Grace indicated that he would like to cooperate with law enforcement but was concerned about whether he would be charged in state or federal court. During the search, Keeney arrived and identified herself as Grace's girlfriend. Initially, Keeney denied having any information about the robbery.

¶20 On June 5, 1998, the State filed an Information charging Grace with robbery, a felony,

in violation of § 45-5-401, MCA, and theft, a felony, in violation of § 45-6-301(1)(a), MCA. On August 21, 1998, Maria Keeney, of her own volition, informed Sowell that Grace had confessed to her and provided details of his admissions. Grace entered a plea of not guilty, and a jury trial commenced on April 5, 1999.

¶21 During the trial Grace denied any participation in the robbery. He implicated Spangelo as the guilty party and characterized Keeney's testimony as a lie. Spangelo and Keeney both testified to Grace's admissions of commission of the crimes.

¶22 On April 8, 1999, the jury returned its verdict finding Grace guilty of robbery and theft. The District Court subsequently sentenced Grace to 20 years in prison for the robbery and 5 years in prison for the theft conviction. On May 7, 1999, Grace filed a motion for a new trial pursuant to § 46-16-702, MCA. The District Court denied the motion on June 10, 1999. Grace appeals.

## STANDARD OF REVIEW

¶23 Motions requesting a new trial are governed by § 46-16-702, MCA. A decision to grant or deny a motion for a new trial lies within the sound discretion of the district court. This Court will not disturb that decision on appeal unless the appellant demonstrates that the district court abused its discretion. *See State v. White Clay*, 1998 MT 244, ¶ 13, 291 Mont. 147, ¶ 13, 967 P.2d 370, ¶ 13.

## ISSUE ONE

¶24 Whether the District Court erred in denying Grace's motion for a new trial based on insufficiency of accomplice corroborative testimony?

¶25 Grace argues that the District Court erred in denying him a new trial because of insufficiency of evidence corroborating Spangelo's accomplice testimony. The State contends that the District Court properly concluded that there was sufficient corroborative evidence to connect the defendant with the commission of the offense. We agree.

¶26 Accomplice testimony, such as the testimony by Spangelo, must be corroborated "by other evidence that in itself and without the aid of [such] testimony . . . tends to connect the defendant with the commission of the offense." Section 46-16-213, MCA. We have established certain criteria to determine whether corroborating evidence is sufficient.

Corroborative evidence must clearly be independent, point towards the defendant's guilt, and provide a legally sufficient connection between the defendant and the offense. *State v. Paulson* (1991), 250 Mont. 32, 46, 817 P.2d 1137, 1145-46. Corroborative evidence must show more than the mere fact that a crime was committed or the circumstances of its commission. It must raise more than a suspicion of the defendant's involvement in, or opportunity to commit, the crime charged. Corroborative evidence, however, need not be sufficient in and of itself to support a conviction or even to make out a prima facie case against a defendant. *See, e.g., State v. Berger*, 1998 MT 170, ¶¶ 27-28, 290 Mont. 78, ¶¶ 27-28, 964 P.2d 725, ¶¶ 27-28. In addition, corroborating evidence is not insufficient merely because it is circumstantial, disputed, or possibly consistent with innocent conduct; it is the jury's duty to resolve such factual questions. *State v. Kaczmarek* (1990), 243 Mont. 456, 460, 795 P.2d 439, 442.

¶27 In the case at hand, there was sufficient corroborating evidence presented at trial to support the theory of the prosecution and contradicting Grace's theory that Spangelo was the robber. We cite but a few examples. For instance, Spangelo informed law enforcement officials that just prior to the robbery Grace was dressed in blue jeans, a dark windbreaker that zipped up the front, and a white motorcycle helmet. The bank tellers at both bank branches provided a very similar description of the robber's clothing. In addition, testimony of the bank tellers consistently identified the robber as being between five foot ten and six feet tall. Surveillance tapes from both banks confirmed the height of the robber. Grace is five foot ten inches, but Spangelo is much taller at six foot three inches.

¶28 Although testimony indicated that both Spangelo and Grace had previously worn the motorcycle helmet used in the robbery, the hairs recovered from inside the helmet were consistent with Grace's hair and inconsistent with the hair samples of Spangelo.

¶29 Spangelo reported that Grace told him he first attempted to rob a bank on Tenth Avenue South but aborted the attempt when he realized he knew one of the tellers. Valerie Rawton, a teller at Western Security Bank on Tenth Avenue South, confirmed that she was working the teller line when a male came in wearing a motorcycle helmet. She also indicated that Grace's physical attributes matched those of the man wearing a motorcycle helmet who had entered the bank. She further confirmed that she and Grace had attended school together and occasionally socialized. None of the tellers recognized or knew Spangelo.

¶30 Spangelo also told the authorities about specific items purchased by Grace subsequent

to the robbery. Upon execution of the search warrant, law enforcement recovered most of the items at Grace's apartment.

¶31 Maria Keeney, Grace's ex-girlfriend, also corroborated all of the information that Spangelo provided to law enforcement. Grace claims that Keeney was an accomplice to the robbery and thus her testimony may not be used to corroborate Spangelo's testimony. We disagree. The circumstances where a person may be held legally accountable for the criminal conduct of another and thus qualify as an accomplice for the purposes of the "accomplice testimony corroboration rule" are set forth in § 45-2-302, MCA. A person is legally accountable for the conduct of another when, either before or during the commission of an offense with the purpose to promote or facilitate such commission, such a person solicits, aids, abets, agrees, or attempts to aid such other person in the planning or commission of the offense. Section 45-2-302(3), MCA. Because Keeney had not yet met Grace when he committed the robbery, the clear language of the statute prohibits Keeney from being an accomplice to the robbery. Thus, Keeney's testimony corroborates the testimony of Grace's accomplice, Spangelo.

¶32 In conclusion, ample evidence exists to corroborate the testimony of Spangelo. Thus, the District Court did not err in denying Grace's motion for a new trial.

## ISSUE TWO

¶33 Whether the District Court erred by denying Grace's motion for a new trial based on the State improperly vouching for the credibility of a witness?

¶34 Grace claims that the prosecutor inappropriately vouched for the credibility of Maria Keeney during the State's rebuttal argument, and thus the District Court erred in denying Grace's motion for a new trial. The State contends that Grace's failure to object to any comments during the closing argument precludes this Court's consideration of this issue. We agree.

¶35 Grace failed to object to any prosecutorial comments during the trial. In order to properly preserve an issue for appeal, a defendant must make a timely objection or motion to strike. *See* § 46-20-104(2), MCA; *see, e.g., State v. Martin* (1996), 279 Mont. 185, 197, 926 P.2d 1380, 1388. Grace first raised the issue of the impropriety of the prosecutor's statements in his motion for a new trial. For an objection to be timely, however, it must be made as soon as the grounds for the objection become apparent. *State v. Whitlow* (1997),

285 Mont. 430, 442, 949 P.2d 239, 247. Thus, because Grace waived his objection to the prosecutor's comments by failing to object to the comments, we cannot consider this issue.

¶36 Affirmed.

/S/ JIM REGNIER

We Concur:

/S/ KARLA M. GRAY

/S/ JAMES C. NELSON

/S/ TERRY N. TRIEWEILER

/S/ W. WILLIAM LEAPHART