DA 09-0057

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2010 MT 228

STATE OF MONTANA,

      Plaintiff and Appellee,

v.

DALLAS EDWARD REICHMAND,

      Defendant and Appellant.


APPEAL FROM:    District Court of the Second Judicial District,
In and For the County of Butte/Silver Bow, Cause No. DC 07-144
Honorable Brad Newman, Presiding Judge


COUNSEL OF RECORD:

      For Appellant:

            Joslyn Hunt, Chief Appellate Defender; Jennifer Hurley, Legal Intern,
Helena, Montana

      For Appellee:

            Steve Bullock, Montana Attorney General; John Paulson, Assistant
Attorney General, Helena, Montana


                       Submitted on Briefs:  March 2, 2010

                                Decided:  October 27, 2010


Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1    Dallas Edward Reichmand (Reichmand) was convicted after a jury trial in March 2008 of two counts of Criminal Distribution of Dangerous Drugs, a felony in violation of § 45-9-101, MCA.    Reichmand appeals from the conviction, from the restitution condition of his sentence, and from the District Court's denial of his post-trial motion to set aside the verdict.

¶2    On appeal we consider whether our recent decision in *State v. Goetz*, 2008 MT 296, 345 Mont. 421, 191 P.3d 489, should be retroactively applied to Reichmand's direct appeal and, if so, whether Reichmand's conviction should be reversed.

## PROCEDURAL AND FACTUAL BACKGROUND

¶3    In August 2007, officers working with the Southwest Montana Drug Task Force began investigating whether Reichmand was selling drugs from his residence in Butte, Montana.    Officers recruited Terry Chor to act as an undercover agent to make drug purchases.    On August 21, 2007, Chor arranged to make a drug buy from Reichmand. Agents searched Chor and his vehicle, gave him money to make the buy, and equipped him with a transmitter that allowed agents off-site to hear and record Chor's conversations.    On August 24, 2007, Chor again bought ten morphine tablets for $35 each.    Agents listened to and recorded Chor's conversations during both transactions. Chor and the listening agents testified at the March 2008 trial.    The recordings were played to the jury several times during the course of the trial.    The officers did not obtain a search warrant authorizing use of the electronic monitoring.    Reichmand did not testify

2

or present any other evidence at trial. His defense centered on his contention that he was misidentified as the person who sold drugs to Chor.

¶4 A jury found Reichmand guilty of two counts of felony Criminal Distribution of Dangerous Drugs. On September 5, 2008—after the verdict but two weeks before the scheduled sentencing hearing—Reichmand filed a motion to set aside the jury verdict based on our decision in *Goetz*, which was announced on August 20, 2008. The parties submitted briefs on the motion, including supplemental briefs addressing this Court's latest decision in *State v. Foster-DeBerry*, 2008 MT 397, 347 Mont. 164, 197 P.3d 1004.

¶5 On December 3, 2008, the District Court denied the motion, relying on *Foster-DeBerry*, in which the defendant's appeal was pending when *Goetz* was decided. Foster-DeBerry asked this Court to remand her case so that she could present a *Goetz*-based challenge to the warrantless recording of her conversations during a police investigation. We concluded that she was not entitled to the benefits of retroactive application of *Goetz* because her case was not "similarly situated" for purposes of a newly-announced rule. *Id*. at ¶ 8. *Foster-DeBerry* defined "similarly situated" as having raised the issue addressed by the new rule at the trial court level, thereby preserving it for appeal. *Id.* Utilizing this reasoning from *Foster-DeBerry,* the District Court concluded that Reichmand had failed to assert a *Goetz*-type claim prior to or during trial and was therefore precluded from arguing that he is "similarly situated" to the defendant in *Goetz*. Reichmand now appeals.

## STANDARD OF REVIEW

¶6     Reichmand's appeal requires us to consider the retroactivity of *State v. Goetz*, which is a question of law. We review questions of law de novo. *In re Fair Hearing of Hanna*, 2010 MT 38, ¶ 13, 355 Mont. 236, 227 P.3d 596.

## DISCUSSION

¶7     ***I. Did the District Court err in not granting Reichmand's motion for a new trial based on the retroactive application of the holding in* State v. Goetz*?***

### *A. Appellate review.*

¶8     As an initial matter, we pause to consider our ability to review this issue on appeal. Questions of retroactivity may implicate a number of doctrines, such as plain error review, which allow appellate courts to consider issues that were not presented in the lower court. Given the requirement in our statues that the defendant must object to an alleged error "at trial" in order to preserve his rights to appeal, it would seem that we might need to rely on one of these doctrines to review the present case. Reichmand objected in the lower court several months after the verdict was pronounced, and the language of § 46-20-701(2)(a) and § 46-20-104(2), MCA, greatly restricts appellate review unless objections are made "at the time of trial" or "during trial," respectively. We interpret "trial" here, however, to encompass the entire proceeding in the lower court, and thus may proceed directly to evaluating the retroactivity of *Goetz*.

¶9     This interpretation of "at trial" is supported by the underlying rationale of these statutes—that it is "fundamentally unfair to fault the trial court for failing to rule correctly on an issue it was never given the opportunity to consider." *State v. Gomez*, 2007 MT

4

111, ¶ 21, 337 Mont. 219, 158 P.3d 442, quoting *State v. Martinez*, 2003 MT 65, ¶ 17, 314 Mont. 434, 67 P.3d 207. Where the trial court *was* given an opportunity to rule on the issue, as here, then the objection has been made "at trial" and the defendant has properly preserved the issue for review by this Court. *State v. Waters*, 1999 MT 229, ¶ 24, 296 Mont. 101, 987 P.2d 1142 (interpreting § 46-20-104(2), MCA, as extending through sentencing); see also Commission Comments to § 46-20-104, MCA, at 1067 (2010 Annotations) (emphasizing that the appellate court has the authority to "decide all questions raised by the entire proceeding, below").[1]

¶10 Objecting below at trial is a general requirement of appellate procedure. The District Court ruled that Reichmand was precluded from the retroactive application of *Goetz* because he failed to object at trial and thus he was not "similarly situated" under the rule from *Foster-DeBerry*. As mentioned above, *Foster-DeBerry* defined "similarly situated" as having raised the issue addressed by the new rule at the trial court level, thereby preserving it for appeal. Although we conclude that Reichmand objected "at

---

[1] In his dissent, Justice Rice cites three cases for the proposition that post-trial objections do not properly preserve an issue for appeal. *State v. McWilliams*, 2008 MT 59, ¶¶ 43-47, 341 Mont. 517, 178 P.3d 121; *State v. Misner*, 2007 MT 235, ¶¶ 24-26, 339 Mont. 176, 168 P.3d 679; *State v. Grace*, 2001 MT 22, ¶ 35, 304 Mont. 144, 18 P.3d 1008. In each of these cases, we denied appellate review for failure to object contemporaneously to allegedly objectionable material in the prosecutor's closing argument, citing our longstanding rule that an objection "must be made as soon as the grounds for the objection become apparent" in order to timely preserve the issue for appeal. *McWilliams*, ¶ 45, citing *Grace*; *Misner*, ¶ 24, citing *Grace*; *Grace*, ¶ 35, citing *State v. Whitlow*, 285 Mont. 430, 442, 949 P.2d 239, 247 (1997). In the cited cases, because the grounds for the objection became apparent during the closing argument, we properly applied the rule to block appellate review of post-verdict objections made by the defense. In the present case, in contrast, it is inarguable that the grounds for the objection—the issuance of the *Goetz* decision and its newly applicable disallowance of key evidence used by the prosecution—were *not* apparent until after the verdict. Thus, while the *result* of the present case—that an objection made post-verdict is considered timely—is contrary to the results reached in the cases cited by the dissent, the *rule* in these cases is applied consistently in our decision today.

5

trial" below, since the District Court based its conclusion on the "similarly situated" standard in *Foster-DeBerry*, we take this opportunity to address *Foster-DeBerry*'s place in our retroactivity jurisprudence.

¶11    In previous *Goetz* retroactivity decisions, we have interpreted "similarly situated" to be a retroactivity-specific requirement. We first addressed the retroactivity of *Goetz* in *Foster-DeBerry*, where we relied on *State v. Zivcic*, 229 Wis. 2d 119, 124-25, 598 N.W.2d 565, 568 (Wis. App. 1999), for the proposition that "similarly situated" means having raised the same objection below. The Wisconsin court's definition of "similarly situated" in *Zivcic* was itself based on an invocation of the U.S. Supreme Court's decision in *Griffith v. Kentucky*, 479 U.S. 314, 107 S. Ct. 708 (1987). On closer examination, however, *Griffith* does not appear to support the Wisconsin court's position, and it becomes clear that both *Griffith* and *Teague v. Lane*, 489 U.S. 288, 109 S. Ct. 1060 (1989), used "similarly situated" only to justify retroactive *and* prospective application of new rules of procedure. The majority in *Griffith* used "similarly situated" to explain why the Court's past policy of excluding "clear break" new rules from retroactive application was inequitable. In *Teague*, the Court used "similarly situated" to describe how defendants who were still in the same direct appeals pipeline as the defendant in whose case the new rule was announced were denied the benefit of the new rule once their own cases reached the Supreme Court. These usages make clear that the Court's use of the phrase "similarly situated" is nothing more than a compelling rationale for retroactive application of new rules, rather than limiting new rules to prospective application after the decision is handed down. Thus, it does not appear that there is any convincing

6

support in either the federal rules of retroactivity we have adopted, or in Montana's own subsequent retroactivity jurisprudence, for interpreting "similarly situated" as having objected below. We therefore overrule our decisions in *Foster-DeBerry* and *State v. Foston*, 2009 MT 191, 351 Mont. 85, 209 P.3d 262, insofar as they require an appellant—within the rules of retroactivity—to have raised a *Goetz*-type objection at trial in order for *Goetz* to apply retroactively.

¶12 In conclusion, there is a general rule of appellate procedure that in order to preserve an issue for appeal, the appellant must have raised the issue "at trial." In the context of retroactivity jurisprudence, however, there is no independent requirement that the appellant have objected below, as *Foster-DeBerry* suggests. In order to be "similarly situated" for purposes of retroactivity, the defendant merely has to show that his case is pending on direct review or not yet final.

### B. *The retroactivity of* Goetz.

¶13 We next review the District Court's ruling that Reichmand was not entitled to a new trial as a result of the retroactive application of *Goetz*. This is a question of law, which we review de novo. Retroactivity jurisprudence in Montana is closely intertwined with federal law. The U.S. Supreme Court recently held that each state has the right to craft its own unique retroactivity jurisprudence, using federal requirements as a floor. *Danforth v. Minnesota*, 552 U.S. 264, 128 S. Ct. 1029 (2008). That is, the U.S. Supreme Court's retroactivity analysis for *federal* constitutional errors is binding upon the states when *federal* constitutional errors are involved. *Danforth'*s unequivocal grant of flexibility allows states to hand-pick retroactivity rules for application of new *state* rules.

7

¶14     In *State v. Egelhoff*, 272 Mont. 114, 900 P.2d 260 (1995), we chose to adopt two such rules from *Griffith* and *Teague* and applied them to our own retroactive application of new state rules. We held that the following retroactivity principles were binding on the Montana Supreme Court. First: "[A] new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final." *Id.* at ¶ 21 (citing *Griffith*, 479 U.S. at 328, 107 S. Ct. at 716). Second: "[O]nce a new rule is applied to the defendant in the case announcing the rule, evenhanded justice requires that it be applied retroactively to all who are similarly situated." *Id.* at ¶¶ 21-22 (citing *Teague*, 489 U.S. at 300-01, 109 S. Ct. at 1070). We then held that these new rules would apply retroactively to cases still subject to final decision on direct review as of the date of the opinion.[2] *Id.* at ¶ 24.

¶15     Thus, *Goetz* will retroactively apply to Reichmand if the requirements established in *Egelhoff* are met. As *Goetz* clearly announces a new rule, and Reichmand's case is pending on direct review, not yet final, and thus "similarly situated," we conclude that the requirements in *Egelhoff* are satisfied. The District Court erred in determining that *Goetz* was not retroactively applicable to Reichmand. We must next determine whether this error requires a reversal of Reichmand's conviction. When a trial court commits an error, the record must show that the error was "prejudicial," i.e. not harmless, or we cannot reverse. MCA § 46-20-701. Thus, we will not overturn the District Court despite its

---

[2] After updating these basic retroactivity principles in *Egelhoff*, we adopted Justice Harlan's retroactivity approach to cases on collateral review. Reichmand's appeal is not yet final. Therefore, the collateral review analysis articulated in the remainder of the *Egelhoff* opinion is not germane to the inquiry currently before the Court.

8

incorrect conclusion that *Goetz* was not retroactive to Reichmand unless this error prejudiced Reichmand's right to a fair trial.

¶16 To determine whether an error is "prejudicial," we employ the "cumulative evidence" test set out in *State v. Van Kirk*, 2001 MT 184, 306 Mont. 215, 32 P.3d 735.

### C. *Prejudicial error under* Van Kirk.

¶17 The first step is to determine whether the claimed error is "structural" error or "trial" error. Structural errors are those that affect the framework within which the trial proceeds, rather than an error in the trial process itself. *Id.* at ¶ 38. These errors undermine the fairness of the entire proceeding. Examples include errors in jury selection, total deprivation to right to counsel, and lack of an impartial judge. *Id.* at ¶ 38. These structural errors are presumptively prejudicial and are automatically reversible. In contrast, "trial" errors occur during the presentation of the case to the jury. Trial errors are amenable to qualitative assessment by a reviewing court for prejudicial impact. *Id.* at ¶ 40. Reichmand's alleged error is a trial error. It was an error occurring during the presentation of the case to the jury.

¶18 Because we have determined that the error in this case was a "trial" error, the next step in the *Van Kirk* analysis is to determine whether the error was prejudicial. When inadmissible evidence is introduced and the convicted person alleges prejudice, the burden shifts to the State. The State must then satisfy a two-part test. *Id.* at ¶¶ 43-44; *State v. Peplow*, 2001 MT 253, ¶¶ 46-47, 307 Mont. 172, 36 P.3d 922. First, the State must show that "the fact-finder was presented with admissible evidence that proved *the same facts as the tainted evidence proved*." Second, the State must demonstrate that "the

9

*quality* of the tainted evidence was such that there was no reasonable possibility that it might have contributed to the defendant's conviction." *Van Kirk*, ¶¶ 43-44 (emphasis in original). As we observed in *Van Kirk*, this new test is "inarguably more restrictive" than our previous "overwhelming evidence" test.[3] *Id*. at ¶ 43.

¶19 The audiotape recordings of two separate drug transactions, made by wiring a confidential informant, are inadmissible under *Goetz* and thus "tainted." The recordings or portions of the recordings were played for the jury on three separate occasions during the trial. First, the State played the August 21, 2007 recording of the transaction during Agent David Clark's testimony. Second, the State played the recording of the August 24, 2007 transaction during the same direct examination of Agent Clark. Third, the State played the audiotape during rebuttal closing. Thus, the State will first need to show that it submitted relevant evidence to prove the same facts as were proved by these recordings, and then will need to show that the "quality" of the recordings was such that there was no reasonable possibility that they might have contributed to Reichmand's conviction.

¶20 The first recording contains audio of the confidential informant Chor entering the house, asking "Is Dallas home?" After a few seconds of silence, Chor asks the other person, "You got six?" He responds, "Yeah, I got six." He then counts from one

---

[3] In *Van Kirk*, we rejected the previous "overwhelming evidence" test, which states that other overwhelming evidence of a defendant's guilt can render harmless a district court's error. We observed that over time, this analysis eclipsed the more substantive inquiry of whether the erroneously admitted evidence might have contributed to the conviction. We rejected the old test because it simply tallied the *quantity* of the admissible evidence of guilt instead of evaluating the *qualitative* impact the specific inadmissible evidence might have had on the fact-finder.

hundred, concluding with "two hundred and ten." Chor can then be heard counting twenty dollar bills: "One, two, three, four, five. One, two, three, four, five. Two hundred." He then asks: "And ten?" Chor then presumably hands him the money, saying: "Here you go, buddy." The rest of the tape seems to be small talk followed by Chor's exit from the house.

¶21 The second recording is of the August 24, 2007 transaction. One can hear Chor knock on the door, enter, and say: "Dallas, do you have ten?" To which the other person responds, "Yeah." Chor responds: "Ok, I'll take ten." After the two briefly struggle to get the math right, the other person eventually adds up the amount: "Thirty-five and ten is three hundred and fifty." Chor counts in tens from forty, ending with three hundred and fifty. The other person can be heard saying, "Man, you are good. Here, have a cigarette." Chor asks for a beverage, the other person briefly disappears out of the CI's microphone range, and then returns to count out one through ten (presumably doling out tablets of morphine). Chor says, "Thank you very much. I'm out of here."

¶22 The jury heard the audio transcribed above during direct examination and during closing. Thus, we consider whether the fact-finder was presented with admissible evidence that proved these same facts. We conclude that the jury *was* presented with evidence that proved these same facts, through the testimony of Chor, the confidential informant. On direct examination, Chor testified that he set up the August 21, 2007 transaction, went to the residence, bought the pills, and returned to meet the Task Force at a predetermined location. Chor also testified that on August 24, 2007, he bought ten pills

11

from Dallas. Chor's testimony was admissible and proved, generally, the same facts as the tainted evidence did.

¶23 We therefore move to the second inquiry under *Van Kirk*'s harmless error analysis: was the *quality* of the tainted evidence such that there was no reasonable possibility that it might have contributed to the defendant's conviction? *Id.* at ¶ 44. It is important here to note that the inquiry does not require us to definitively say whether or not the tainted evidence *actually* influenced the jury's decision to convict. Rather, the question is whether the State can show there is no reasonable possibility that the tainted evidence *might* have contributed to the conviction. As we stated in *Van Kirk*, and we reemphasize now, this is a very high bar.

¶24 The State's argument regarding this prong is brief and unpersuasive. The State admits that it used the recordings in response to Reichmand's defense of misidentification: "The primary use of the recordings to refute this defense was to *confirm* Chor had used the name 'Dallas' to refer to the supplier of the morphine tablets." (Emphasis added.) The recordings *confirmed* Chor's testimony, likely bolstering his credibility in the minds of the jurors. Given that the defense had turned a spotlight on Chor's potential ulterior motives, his shaky mental capacity, and his inability to remember parts of the transactions or names of officers he worked with, there is no doubt the recordings "possibly" influenced the outcome. The recordings provided the jurors with just what they needed in order to fully believe Chor: actual, objectively reliable recordings of everything that happened during both transactions.

12

¶25 The recordings also filled in chronological gaps in the testimony of the agents who, without the recordings, could only testify to how they prepared Chor for the transactions and their observations of Chor when he again met with agents after the transactions. They could not see the back entry of the house or observe the drug transactions inside the house. The circumstantial evidence was far from conclusive. Chor and the agents all testified that there were other people in the residence at the time of both transactions. The recordings of both transactions constituted objective and qualitatively superior evidence for the jury to compare against Chor's testimony about the details of the transactions and his identification of Dallas as the dealer. The recordings also filled in large holes in the agents' testimony regarding the most critical part of the case: the transaction itself.

¶26 It is hard to imagine that after hearing the recordings, a juror would not be more convinced that what Chor claimed happened actually did happen. The State admits to using the recordings as a means of corroborating Chor's testimony. The state not only played and emphasized both recordings on direct, but also replayed a portion of the recording in its rebuttal closing. That recording was the sole piece of evidence the State presented again to the jury during closing arguments. In light of the above facts, the State has failed to demonstrate there is no reasonable possibility that the recordings might have contributed to the defendant's conviction.

¶27 The State has not met its burden under *Van Kirk*, and thus the error is prejudicial and "reversal is compelled." *Id.* at ¶ 45. We reverse Reichmand's conviction and

remand for a new trial. Because we find that he is entitled to a new trial, we need not reach the other issues Reichmand presents for appeal.

¶28    Reversed and remanded.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ PATRICIA O. COTTER
/S/ MICHAEL E WHEAT
/S/ BRIAN MORRIS

Chief Justice Mike McGrath Concurs.

¶29    I concur in the result reached by the Court, but I write separately to clarify some of the issues of law involved.

¶30    *Goetz* was decided after Reichmand's conviction but before sentencing, and he brought the issue to the District Court promptly.[1]    Whether or not that was a "timely objection during trial" under § 46-20-104(2), MCA, Reichmand is clearly entitled to have this Court review the issue under § 46-20-701(2)(a), MCA.    That statute provides that a claim of error affecting constitutional rights may be "noticed on appeal" even if there was no objection in the district court if the error was prejudicial to the defendant's guilt or punishment and the "right asserted in the claim did not exist at the time of the trial and

---

[1] Requiring that defendants qualify for appellate review by objecting to evidence that was admissible under settled law at the time of trial requires a high level of clairvoyance.    It may also lead to defendants "inevitably making a long and virtually useless laundry list of objections to rulings that were plainly supported by existing precedent." *Johnson*, 520 U.S. at 468, 117 S. Ct. at 1549.    That would be an unwarranted waste of time and judicial resources.

14

has been determined to be retroactive in its application." The *Goetz* decision was based upon the right of privacy and the search and seizure protections of Art. II, Secs. 10 and 11, of the Montana Constitution and thus meets the requirement that the issue affects constitutional rights. Second, the fact that warrantless electronic surveillance evidence was admitted and used at trial should be a sufficient prima facie showing that it was prejudicial to the finding of Reichmand's guilt, meeting another requirement of the statute. Third, the rights determined by *Goetz* did not exist at the time of Reichmand's trial, and *Goetz* has now been determined to be retroactive, meeting the last requirements of the statute.

¶31 It is clear that § 46-20-701(2)(a), MCA allows this Court to "notice" Reichmand's *Goetz* issue on appeal and to determine whether use of the warrantless electronic surveillance evidence against him warrants reversal of his conviction.

¶32 *Goetz* is substantially similar to this case legally and factually. I concur that admission of the evidence prejudicially affected Reichmand's substantial rights. Section 46-20-701, MCA. The warrantless electronic surveillance evidence used at Reichmand's trial was subject to suppression under *Goetz*.[2] That contention was the basis for Reichmand's motion for a new trial, which could have been granted under *Goetz* unless use of the warrantless electronic surveillance evidence was harmless error. I concur with the majority's conclusion that under the current harmless error test from *Van Kirk*, there

---

[2] We should not, of course, expect a high level of clairvoyance from the District Court as we did not so expect of Reichmand. At the time Reichmand made his motion the District Court followed the apparent law set out in *Foster-DeBerry*.

15

is a reasonable possibility that the electronic surveillance evidence contributed to the verdict. Therefore, the error was not harmless.

¶33 I concur in the result reached by the majority.

/S/ MIKE MCGRATH

Justice James C. Nelson joins in the foregoing concurrence.

/S/ JAMES C. NELSON

Justice Jim Rice, dissenting.

¶34 The Court fails to even acknowledge our established canons of statutory construction, our contrary caselaw, and the principles of retroactivity applied by federal and state courts throughout the country in reaching its decision. The Court's faulty analysis leads to use of a harmless error analysis instead of a plain error analysis which should be used under the plain error statute—particularly in light of the statute's legislative history, which the Court also ignores. Applying the correct analysis, I would affirm.

¶35 The Court's analysis confuses two different issues. Under the law, the retroactivity of a new constitutional principle is completely distinct from the questions of whether a defendant has preserved the issue for appeal, whether this Court should take up the issue, and under what standards to do so. These concerns ask whether this Court should address Reichmand's *Goetz* issue for the first time on appeal where he failed to

16

raise the argument to the District Court before or during his trial. The law is clear that retroactive application of a new constitutional rule does not relieve a defendant's obligation to preserve the issue for appeal—even under the plain error statute. This principle was recognized recently by the U.S. District Court for the District of Montana:

> Petitioner is not correct that retroactivity extends to cases where, as here, the issue was not properly preserved for appeal. The Montana Supreme Court is not *required* to recognize and address errors that were not objected to at trial.

*Paranteau v. Mahoney*, 2010 U.S. Dist. LEXIS 66634 at * 7 (D. Mont. Apr. 8, 2010) (emphasis added).

¶36    The Court's error begins with its application of § 46-20-701(2), MCA. We have explained that this provision is Montana's "plain error statute" which mirrors the federal plain error doctrine and "codified the common law doctrine of plain error." *State v. Finley*, 276 Mont. 126, 132-33, 915 P.2d 208, 212-13 (1996), *overruled on other grounds*, *State v. Gallagher*, 2001 MT 39, ¶ 21, 304 Mont. 215, 19 P.3d 817. The Court acknowledges that the plain error statute "greatly restricts appellate review unless objections are made 'at the time of trial' or 'during trial,' " Opinion, ¶ 8, but then, without acknowledging our canons of statutory construction and our contrary precedent, simply leaps to the conclusion that the phrases "at the time of trial" and "during trial" actually can mean "five months after trial," or, apparently, any time after trial.

¶37    It is necessary to once again repeat the law's instruction to us about statutory interpretation. The Court renders its interpretation without employing the law's guides— apparently because they are facially contradictory to the Court's interpretation. "In

17

ascertaining legislative intent, we look first to the *plain meaning* of the words used." *State v. Stanczak*, 2010 MT 106, ¶ 17, 356 Mont. 263, 232 P.3d 896 (citing *Van Der Hule v. Mukasey*, 2009 MT 20, ¶ 10, 349 Mont. 88, 217 P.3d 1019) (emphasis added). "During trial" plainly means "during trial"—not five months after trial concludes. Indeed, the Court's repeated use of quotation marks when stating its holding that Reichmand objected "at trial," is a wink to the reader that this holding is directly contrary to the statute's plain meaning.

¶38    It is also directly contrary to our precedent. Consistent with the statutes, our cases clearly hold that post-trial objections do not properly preserve an issue for appeal, but are waived. *See* § 46-20-104(2), MCA, *State v. McWilliams*, 2008 MT 59, ¶¶ 43-47, 341 Mont. 517, 178 P.3d 121; *State v. Misner*, 2007 MT 235, ¶¶ 24-26, 339 Mont. 176, 168 P.3d 679; *State v. Grace*, 2001 MT 22, ¶ 35, 304 Mont. 144, 18 P.3d 1008.

¶39    This conflict is significant under the plain error statute because, in contrast to other appellate statutes, the plain error statute provides that waived issues may not even be "noticed" on appeal unless the defendant satisfies a threshold burden to show prejudice as to guilt. *Compare* § 46-20-701(2), MCA, *with* § 46-20-104(1), MCA (appeal may be taken from issues which merely "affect the substantial rights of the defendant"). Thus, this "[codification of] the common law doctrine of plain error," *Finley*, 276 Mont. at 133, 915 P.2d at 213, embodies the same kind of threshold determination to obtain appellate review as applied under the common law—in addition to establishing retroactivity of a new rule.

¶40   This understanding is also supported by the statute's legislative history, which informs the issue of what standards of review are to be applied.   Section 46-20-701, MCA, was first enacted in 1967, and amended in 1983, to provide several instances in which this Court could undertake plain error review, provided the defendant could still demonstrate heightened prejudice.  *Finley*, 276 Mont. at 133, 915 P.2d at 212-13.  When amending the statute in 1983, the Legislature intended to "limit the issues which can be raised by a criminal defendant on appeal," and "to discourage the abuses and prolonged appeals."  Mont. Sen. Jud. Comm., *Minutes of the Hearing on Sen. Bill 2*, 48th Legis., Reg. Sess. 2-3 (Jan. 19, 1983).   In the House Judiciary Committee, Representative Underdal supported the bill out of frustration for appeals "based, not on the question of guilt, but on technicalities."  Mont. H. Jud. Comm., *Minutes of the Hearing on Sen. Bill 2*, 48th Legis., Reg. Sess. 8 (Mar. 16, 1983).  The Legislature sought to limit plain error review to selected circumstances, including retroactivity, when the defendant had actually suffered prejudice *as to his or her guilt or punishment.*

¶41   Consequently, under the plain meaning of the statute, its legislative history, and our cases, traditional plain error standards should be used by the Court in reviewing issues under the plain error statute.  However, instead of following these statutory and common law plain error principles, the Court imports the harmless error analysis of *State v. Van Kirk*, 2001 MT 184, 306 Mont. 215, 32 P.3d 735.  In *Van Kirk*, the defendant had objected in the trial court and preserved the suppression issue, which he then raised on appeal.  *Van Kirk*, ¶ 9.  We thus formulated in *Van Kirk*, ¶¶ 29, 36, a new test for applying the *harmless error* analysis under § 46-20-701(1), MCA, to address prejudice to

the defendant from trial errors objected to at trial—not the *plain error* analysis under § 46-20-701(2), MCA, for errors waived at trial. "We therefore deem it appropriate to formally adopt an approach to harmless error issues. . . ." *Van Kirk*, ¶ 36.

¶42    Harmless error is much different than plain error, involving different purposes, standards, and burdens, and I believe the Court is making a mistake in incorporating *Van Kirk* harmless error standards into a plain error analysis. Under harmless error, the burden is on the State, which committed the error over defendant's objection, to demonstrate the lack of prejudice to the defendant because of that error. *Van Kirk*, ¶ 42 ("[I]t then becomes incumbent on the State to demonstrate that the error at issue was not prejudicial."). Under plain error, it is the defendant who permitted the error to occur by failing to object, not the State, and the defendant thus bears the burden of demonstrating a need for review which overcomes that error. Further, the harmless error standard of review is a lesser standard than plain error, and is contrary to the plain language of the statute and the clearly expressed intent of the Legislature. Harmless error requires reversal merely when there is a "reasonable possibility" that "inadmissible evidence might have contributed to a conviction." *Van Kirk*, ¶ 42. Under plain error, as explained in *Finley*, prejudicial error is that which constitutes "a manifest miscarriage of justice, may leave unsettled the question of the fundamental fairness of the trial or proceedings, or may compromise the integrity of the judicial process." *Finley*, 276 Mont. at 137, 915 P.2d at 215. We should not confuse the two, but rather apply *Van Kirk* harmless error standards under the harmless error statute, and apply *Finley* plain error standards under the plain error statute.

20

¶43 This error is further evidence by the nation's jurisprudence. Although acknowledging that "[r]etroactivity jurisprudence in Montana is closely intertwined with federal law," Opinion, ¶ 13, the Court woefully misunderstands federal law on this point. The United States Supreme Court's retroactivity jurisprudence clearly supports the principle that a defendant waives a new constitutional rule of criminal procedure by failing to object, even when the new rule had not been announced until after the defendant's trial. In cases in which the Supreme Court has determined whether a new constitutional rule of criminal procedure is retroactive, the defendant who sought retroactive application of the new rule had objected, thereby preserving the issue for appeal.[1] In *Shea v. Louisiana*, the Supreme Court began by reiterating that the issue to be decided was "whether [the] ruling [in *Edwards v. Arizona*] applies retroactively with respect to petitioner's convictions **when the issue was raised** and his case was pending and undecided on direct appeal in the state system at the time *Edwards* was decided." *Shea v. La.*, 470 U.S. 51, 55, 105 S. Ct. 1065, 1068 (1985) (emphasis added). The *Shea*

---

[1] *See Linkletter v. Walker*, 381 U.S. 618, 621, 85 S. Ct. 1731, 1733 (1965) (defendant moved to suppress evidence seized from his home and business in search incident to arrest), *overruled in part*, *Griffith v. Ky.*, 479 U.S. 314, 107 S. Ct. 708 (1987); *Desist v. U.S.*, 394 U.S. 244, 244-46, 89 S. Ct. 1030, 1031 (1969) (defendants moved to suppress wire-tapping evidence as a violation of their Fourth Amendment rights); *Mackey v. U.S.*, 401 U.S. 667, 669, 91 S. Ct. 1160, 1162 (1971) (defense counsel objected to the introduction of specific exhibits, "arguing that they were prejudicial, inflammatory, and irrelevant"); *U.S. v. Johnson*, 457 U.S. 537, 539, 102 S. Ct. 2579, 2581 (1982) ("Before trial, respondent sought to suppress his oral and written statements as fruits of an unlawful arrest . . . ."), *overruled in part*, *Griffith*, 479 U.S. 314, 107 S. Ct. 708; *Shea v. La.*, 470 U.S. 51, 52-53, 105 S. Ct. 1065, 1066 (1985) (defendant both objected and filed a motion to suppress his confession); *Allen v. Hardy*, 478 U.S. 255, 256, 106 S. Ct. 2878, 2879 (1986) (defense counsel moved to discharge venire panel on constitutional grounds); *Griffith v. Ky.*, 479 U.S. at 317, 107 S. Ct. at 710 (counsel requested an explanation for the prosecution's striking of four prospective black jurors, and moved for discharge of the panel on Sixth and Fourteenth Amendment constitutional grounds).

Court held that "if a case was pending on direct review at the time *Edwards* was decided, the appellate court must give retroactive effect to *Edwards*, *subject, of course, to established principles of waiver, harmless error, and the like*." *Shea*, 470 U.S. at 59 n. 4, 105 S. Ct. at 1070 n. 4 (emphasis added).

¶44 The Supreme Court recently reaffirmed these principles in *United States v. Booker*, explaining that retroactive application of a new constitutional rule of criminal procedure will not necessarily lead to a new trial or sentencing hearing. *U.S. v. Booker*, 543 U.S. 220, 268, 125 S. Ct. 738, 769 (2005). "That is because we expect reviewing courts to apply ordinary prudential doctrines, determining, for example, whether the issue was raised below and whether it fails the 'plain-error' test." *Booker*, 543 U.S. at 268, 125 S. Ct. at 769.[2]

¶45 In *Johnson v. United States*, 520 U.S. 461, 117 S. Ct. 1544 (1997), the Supreme Court undertook the defendant's retroactivity claim under plain error review standards because the defendant had failed to preserve the issue by objecting. The Supreme Court described its review under the plain error rule as discretionary, not mandatory. *Johnson*, 520 U.S. at 467, 117 S. Ct. at 1549. Further, the Supreme Court ultimately *denied* relief to Johnson because, even though the new rule was retroactive, under plain error there was

---

[2] In addition to waiver, the Supreme Court similarly applied principles of procedural default, for failure to preserve an argument, in the retroactivity context in *Bousley v. U.S.*, 523 U.S. 614, 118 S. Ct. 1604 (1998), and *Engle v. Isaac*, 456 U.S. 107, 102 S. Ct. 1558 (1982).

"no basis for concluding that the error 'seriously affected the fairness, integrity or public reputation of judicial proceedings.' " *Johnson*, 520 U.S. at 470, 117 S. Ct. at 1550.[3]

¶46　These principles are not limited to federal jurisprudence, but are broadly recognized in different states and federal circuits: *Membres v. State,* 889 N.E.2d 265, (Ind. 2008) (recognizing the objection requirement for new state constitutional rules applied retroactively); *Milligrock v. State*, 118 P.3d 11, 15 (Alaska App. 2005) (citing *Johnson*, 520 U.S. at 466-67, 117 S. Ct. at 1548-49; *Haag v. State*, 117 P.3d 775, 782 (Alaska App. 2005)); *Ned v. State*, 119 P.3d 438, 443 (Alaska App. 2005) (citing *Johnson*, 520 U.S. 461, 117 S. Ct. 1544; *U.S. v. Cotton*, 535 U.S. 625, 122 S. Ct. 1781 (2002)); *State v. LaClair*, 433 A.2d 1326, 1328-29 (N.H. 1981); *State v. Cross*, 234 P.3d 288 (Wash. App. Div. 2 2010); *State v. Holder*, 745 P.2d 141 (Ariz. 1987); *People v. Lann*, 633 N.E.2d 938 (Ill. App. 1st Dist. 1994); *State v. Hutchinson*, 342 S.E.2d 138 (W. Va. 1986); *Poole v. State*, 846 So. 2d 370 (Ala. Crim. App. 2001); *U.S. v. Deitz*, 577 F.3d 672, 687-88 (6th Cir. 2009) (no plain error in a case in which the defendant failed to preserve the question for appellate review); *People v. Woods*, 331 N.W.2d 707, 725 (Mich. 1982) (holding *Sandstrom v. Mont.*, 442 U.S. 510, 99 S. Ct. 2450 (1979), would be retroactively applied to pending cases where error was properly raised and preserved); *McBee v. Grant*, 763 F.2d 811 (6th Cir. 1985); *Rodriguez v. U.S.*, 286 F.3d 972 (7th Cir.

---

[3] The Concurrence cites to *Johnson*'s statement regarding avoidance of " 'a long and virtually useless laundry list of objections to rulings that were plainly supported by existing precedent.' " Concurrence, ¶ 30, n.1 (quoting *Johnson*, 520 U.S. at 468, 117 S. Ct. at 1549). Ironically, this statement was made by the *Johnson* Court in support of its application of plain error review, which the Concurrence opposes, to demonstrate that such review is undertaken for errors which are " 'plain' " at the time of retroactive appellate review, not to excuse the necessity of objecting altogether. *Johnson*, 520 U.S. at 468, 117 S. Ct. 1549.

2002) (petitioner sentenced prior to *Apprendi* waived his *Apprendi* claim by failing to raise it in district court); *U.S. v. Palmer*, 297 F.3d 760, 767 (8th Cir. 2002) ("[T]hat *Apprendi* as a legal precedent did not exist before the prior appeal in the present case . . . did not excuse [one of the defendants] from the burden of raising an *Apprendi*-like argument in the first appeal."); *U.S. v. Sanchez-Cruz*, 392 F.3d 1196 (10th Cir. 2004), *vacated*, 544 U.S. 970, 125 S. Ct. 1866 (2005), *aff'd in part and reinstated in part*, 143 Fed. Appx. 116 (10th Cir. 2005); *U.S. v. Stearns*, 387 F.3d 104 (1st Cir. 2004).

¶47 Thus, our statutes and case precedent alike, in order to preserve the integrity of the judicial system, have stated and restated the rule requiring objections and have required appellants to bear the greater burden of demonstrating plain error if they have not properly preserved the issue. Under this long-established principle, whether a defendant has objected is clearly relevant, even for purposes of retroactive application of new rules. If a defendant properly preserves the issue by objecting—and Reichmand could have done so just as easily as Goetz—then he or she is automatically entitled to raise the retroactivity issue on appeal for consideration by the appellate court. If not, then the defendant must satisfy plain error standards.

¶48 Further reasons to apply established plain error standards are the similarities and purposes of the federal and state plain error tests. Our *Finley* plain error test is nearly identical to the plain error test announced in *U.S. v. Atkinson*, 297 U.S. 157, 160, 56 S. Ct. 391, 392 (1936), and followed in *U.S. v. Olano*, 507 U.S. 725, 736, 113 S. Ct. 1770, 1779 (1993), *Johnson*, 520 U.S. at 467, 117 S. Ct. at 1549, *U.S. v. Cotton*, 535 U.S. at 631-33, 122 S. Ct. at 1785-86, and a host of other cases. The *Atkinson* plain error test

was eventually codified as Federal Rule of Criminal Procedure 52(b), *see Olano*, 507 U.S. at 736-37, 113 S. Ct. at 1779, which formed the basis for the plain error doctrine applied in *Johnson*, 520 U.S. at 465-70, 117 S. Ct. at 1548-50. The federal and state plain error tests serve the same purpose: to review fundamental error, even in the absence of a contemporaneous objection, that otherwise would result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the trial or proceedings, or compromise the integrity of the judicial process. Employing the *Van Kirk* test not only disregards our plain error test, our plain error statute, and its legislative history, but also the directive of *Johnson* and the substantial federal guidance on this issue.[4] I suspect that, at some point in the future, fresh eyes will see the folly in failing to apply plain error standards under the plain error statute, and will restore common law review standards to the statute as originally intended. If the Legislature grows impatient for that day, it may want to consider adding language to the statute requiring it to be applied as originally intended.

¶49 **Plain Error Application to Reichmand's Claims**

¶50 I do not believe that admission of the electronic recordings between Reichmand and Chor resulted in a manifest miscarriage of justice, unsettled the fundamental fairness of Reichmand's trial, or compromised the integrity of the judicial process against him.

---

[4] Applying these principles, I do not believe the Court's decision today requires that *Foster-DeBerry* and *Foston* be overruled. The *Foster-DeBerry* decision, in particular, recognized the requirement that the defendant must object to preserve error for appeal. The Court there noted that, unlike here, the defendant had not made a plain error argument which could have allowed the *Goetz* issue to be considered. *Foster-DeBerry* thus left open the question we answer in this case. Adhering to *stare decisis*, I would not overrule those decisions. *Certain v. Tonn*, 2009 Mont. 330, ¶ 19, 353 Mont. 21, 220 P.3d 384; *State v. Kirkbride*, 2008 MT 178, ¶ 13, 343 Mont. 409, 185 P.3d 340.

*See Finley*, 276 Mont. at 137, 915 P.2d at 215. The State's case at trial rested heavily on the testimony of the confidential informant Terry Chor. The electronic recordings were marginal evidence at best, and merely cumulative of a fraction of Chor's testimony, while the evidence supporting Reichmand's guilt was overwhelming and largely uncontroverted.

¶51 The recorded conversations, combined, lasted a total of about five minutes. During the trial, Reichmand was first to inquire about the substance of the recordings when, during the recross-examination of the State's fourth witness, Agent Martenson, his counsel attempted to demonstrate that Martenson couldn't identify the individuals speaking on the recording. The State presented the testimony of five witnesses: a forensic scientist, three drug task force agents, and confidential informant Chor. The State played the electronic recordings only during the testimony of its final witness, Agent David Clark, and played a brief portion of one of the audiotapes in rebuttal closing. The recording was of such poor quality that, during rebuttal closing argument, the court reporter could not transcribe the recording because it was "not audible."

¶52 Reichmand's defense was mistaken identity—that Reichmand's brother was really the person who had sold the drugs. The State offered the recordings to reiterate Chor's testimony that he had purchased the drugs from "Dallas" Reichmand. However, Chor's own testimony established this point on numerous occasions. Chor testified that he had been to Dallas' home to purchase drugs "[f]orty, 50 times" over the course of "about a year and a half." During his testimony, Chor identified Dallas on at least *four separate occasions*, during both direct and cross examination, as the man from whom he bought

26

the drugs. At one point, the following exchange occurred between the prosecutor and Chor:

Q. When you went in the house, who did you meet with?
A. Dallas. Dallas.
Q. And how do you know Dallas again?
A. That's Dallas.
Q. That's Dallas[?] Is that the person you purchased the drugs from?
A. Yes, it is.

. . .

Q. Do you know the man or the person you purchased those drugs from?
A. Yes. This man right here, Dallas.

¶53 I disagree with the Court's statement that the electronic recordings provided "objective and qualitatively superior evidence" admitted at trial, Opinion ¶ 25. Three agents with the Southwest Montana Drug Task Force and Montana Department of Justice all testified as to the protocol they followed for the two separate drug transactions with Reichmand. Agent Clark described the officers' involvement with Chor in gathering evidence against Reichmand:

> We usually meet with the informant at a prearranged location, away from everybody. At that time, the informant is searched, his vehicle is searched for any items of contraband or money he might have. . . . At this point, we sometimes place a phone call to a suspect or we place an electronic transmitting device, or a wire, on the informant, give the informant some money. The informant is then followed to the location of a suspect by agents.
> At that time, the informant goes to wherever the suspect is. It could be anywhere. In this instance, it was a house. He goes in the house, makes a transaction, comes back out, drives away. We follow him back to a prearranged meeting location, where, at that time, we take the dangerous drugs from him. And the informant is then searched for any items of contraband or money. His vehicle is also searched. The wire, the electronic transmitting device, is then removed. And we usually have an interview with him, a taped interview, of what occurred during the transaction.

The officers prearranged the meeting with Reichmand by searching Chor and his vehicle and giving Chor traceable money to purchase the drugs. In that way, any money spent or kept, and any illicit drugs removed from Chor after the purchase, were objective evidence of the criminal drug transactions with Reichmand. Further, the agents followed Chor to Reichmand's house, surveilled the house while Chor was inside for the time necessary to make the drug purchases, followed him back to a prearranged location where they confiscated the drugs and money, and then interviewed him. All of this was objective, credible evidence against Reichmand.

¶54 As we did in *State v. Schwartz*, 2009 MT 234, 351 Mont. 384, 212 P.3d 1060, I would affirm Reichmand's convictions on the basis of the other evidence and conclude that the recordings here did not result in a manifest miscarriage of justice.

/S/ JIM RICE